# Wheeling.

GEORGE W. THOMPSON, *et al. vs.* JOSIAH D. UPDEGRAFF, *et al.*

August Term, 1869.

1. On the trial of an issue to try the validity of a will, the contestants, who
were defendants in the issue, were permitted to prove that the testator
said, after the will in controversy was made, that one of the devi-
sees, who was a plaintiff, did not want him to give certain other parties,
children of a deceased son of the testator, anything, which evidence was
stated to be for the purpose of proving the declaration of the devisee. The
court below held that the declarations of any of the plaintiffs in the issue
were proper evidence to be offered. HELD:

    1. That the evidence was improperly admitted for the purpose stated,
      being hearsay in its character.

    2. That the declarations of the testator were admissible for the purpose
      of showing the state and the condition and operations of the mind
      of the testator at the time he made the will, and for no other pur-
      pose ; and to lay the foundation of other and more direct testimony
      showing that improper influences were exerted on him.

2. On a like trial, the plaintiffs, who were the propounders of the will, proved
that the testator had executed a codicil on the 25th day of January, 1864,
which was in evidence before the jury, in which he stated that he had
theretofore made a will and a codicil thereto relating to a bequest to a
negro servant of certain stock, and revoked the bequest, and gave the
stock to another ; and for the purpose of explaining in this codicil the
reference made therein, to the bequest to the negro servant, the plaintiffs
were permitted to prove by a witness, that after the date of the will in
controversy, the testator in the presence of the witness destroyed, by
burning, a previous will, and another paper not described by the witness.
The plaintiff then asked the witness to state what the testator then said in
reference to the nature of the papers destroyed, which being objected to,
the objection was sustained. HELD :

    That the plantiffs having proved the destruction of the previous will
    and codicil referred to in the codicil of January 25th, 1864, as it
    was competent for them to do, and having without objection, proved
    the destruction of another paper, they had proved an act of the
    testator pertinent to the inquiry before the jury, and were entitled
    to give in evidence the declarations of the testator made at the
    time of the act as a part of the *res gestœ,* to go to the jury to be
    considered by them for what they were worth in their estimation.

3. A party left the court room during a trial and proceeded with dispatch about three squares in the city of W., to procure the attendance of a female witness, who was stopping at a hotel and was indisposed; when he returned the evidence was closed, and he asked, after verdict, a new trial upon the ground of surprise. It is held that inasmuch as it does not appear that the counsel for the party asked the court to wait for his return, or stated to the court that they desired to offer other evidence, nor, but that the evidence was closed by consent of his counsel, that the matter thus set up shows no ground for a new trial.

4. A witness testifies that a juror, on the second day of a trial, told him, at recess at noon, that "Mr. T.," one of the parties to the trial, "would lose the trial." This the juror denies in his testimony. Another witness testifies that the juror, some months before the trial, said in a conversation, that "they are going to break the Steenrod will;" that he thought it was right to break it; that they would break it for T. had drawn it himself; that he had been informed that Mrs. T., (daughter of the testator and wife of T.) had informed her father how to make the will, and that they would be able to prove that T. had drawn the will. Another witness testifies that a few months before the trial, the juror said to witness, "it was no use for T. to sue for he would get beat; it was not Steenrod's will, it was Mr. T.'s will." The juror testifies that he does not remember any of these conversations, though he might have had them, as the case was considerably talked of; that he had not made up or expressed an opinion before or at the time he was sworn as a juror, he knew nothing about the case that he could put confidence in until he heard the testimony. That he felt no bias at the time of the trial against the plaintiffs. HELD:

   1. That to disqualify a juror an opinion must be deliberate and decided.

   2. That the juror was not disqualified.

Daniel Steenrod, of Ohio county, departed this life in April 1864. At the May term, following, a paper, purporting to be his last will and testament, with four codicils thereto attached, was produced in the circuit court of Ohio county, and, after being duly proved, was admitted to record. Elizabeth S. Thompson and George W. Steenrod were named executrix and executor in the will.

At the July rules, 1864, of the same court, Catherine O. Updegraff, with Josiah T. Updegraff, her husband, Stephen O. Feeney, Elizabeth Feeney, Mary Feeney, Emma Feeney, George S. Feeney and Annie G. Feeney, an infant, by J. T. Updegraff, her next friend, filed a bill in the clerk's office of the circuit court of Ohio county, alleging that

from great age and bodily infirmity the testator was not of sound mind and disposing memory, and had not mental capacity. The bill also alleged that Elizabeth S. Thompson, with George W. Thompson, her husband, Emma B. Carter, Johnson N. Camden, a trustee nominated in a codicil to hold the estates of Elizabeth S. Thompson and Emma B. Carter in trust, George W. Steenrod, Daniel Steenrod, Sarah E. Pennington, with Hiram Pennington, her husband, Emma G. Troll, with Conrad Troll, her husband, and Eliza J. Steenrod, had respectively entered into possession of the devises made to them in the will, and were seeking to obtain from Andrew White, administrator *cum testamento annexo*, (Mrs. Thompson and Geo. W. Steenrod having declared and made known on the 12th day of May, 1864, in open court, that they wished Mr. White to administer, instead of themselves,) the legacies devised to themselves, and were confederating together to wrong the complainants. The bill prayed that the parties named as confederating might be required to answer it, and that a jury might be ordered to ascertain whether any, and if any, how much of what was offered for probate, was the last will of the testator; that the paper and codicils, purporting to be the last will, be rejected, and the certificate of probate be vacated; and that the estate of the testator be distributed and partitioned according to law, among his heirs at law.

The paper purporting to be the will, bore date the 22d of November, 1863, and the codicils respectively November 9th, 1862, January 25th, 1864, February 29th, 1864, and March 10th, 1864.

An issue was directed and a jury ordered to be empanneled. By election of the parties all of them became defendants to this issue, except George W. Thompson and wife, Emma B. Carter, and Johnson N. Camden, trustee, who were designated as plaintiffs.

Emma B. Carter filed her answer to the bill, denying many of its allegations, which it is not necessary to mention here, and expressly denying any failure of mental vigor or capacity in the testator at the time of making his will, or

down to the close of his life. Thompson and wife answered, adopting the answer of Emma B. Carter, and alleging it in substance and effect, to be correct.

The jury, on the 2d day of November, 1866, brought in a verdict, finding that the papers before them, purporting to be the last will and testament and codicils of Daniel Steenrod, were not, nor either of them, his testament and codicils. During the progress of the trial, the defendants to the issue offered to prove by a witness, that after the execution of the will the testator informed witness that the Thompsons, meaning George W. Thompson and his wife, the latter a devisee in the will, did not want him to give anything to the children of Edward Steenrod, a deceased son of the testator, which evidence was offered for the purpose of proving the declarations of the devisees. The plaintiffs objected to the admission of this testimony, but the court overruled the objection and decided that the declarations, of any of the plaintiffs in the issue, were proper evidence; whereupon the plaintiffs excepted.

After the propounders of the will and codicils had given evidence tending to prove the due execution thereof, and that the testator was, in all respects, competent, under the law, to make such will and codicils at the time the same were made, and after the will and codicils had been read to the jury, the propounders of the will and codicils, for the purpose of accounting for the reference in the codicil of the 25th day of January, 1864, to a bequest of ten shares of the stock of the North Western Bank of Virginia, to the woman Leann, offered to prove by a witness, Andrew White, that the testator and his daughter, Elizabeth S. Thompson, had called at the North Western Bank, in which the witness was then a clerk, and where the testator left his valuable papers, deposited in a box, after the time of the execution of the supposed will of the 22d of November, 1862; that the testator requested the witness to get his box of papers, and get from it, for him, a previous will he had deposited there, and also another paper described by him. That he found the paper and handed it, with the previous

will, both of which were sealed up, to the testator; that the testator afterwards handed the will and the other paper back to the witness and told him to destroy them; that the witness did not see the contents of the paper, nor did he read them or know of his own knowledge what they were; that they were destroyed by being thrown into the fire. The propounders then asked witness to state what was said by testator at the time the papers were destroyed, in reference to the nature of the papers, and what they were. To the witness so stating, the contestants of the will objected, and the court sustained the objection, and refused to permit the witness to state what was said by the testator at the time the papers were destroyed, in reference to the same—that is to say, the nature of the papers and what they were. And to the opinion of the court excluding this testimony, the propounders of the papers excepted.

The third bill of exceptions was taken because the plaintiffs offered to prove at the time the testator called for the papers at the bank that he asked for particular papers, and upon asking the witness what papers the testator asked for, the defendants objected, which objection being sustained by the court, the plaintiffs excepted.

A motion was made to set aside the verdict and grant a new trial. One ground of this motion was founded on an affidavit of George W. Thompson, who stated that he was attending to the trial of the issue as in duty bound to his wife, and as the representative of his sister-in-law, Mrs. Carter. That on the last day of the trial he observed that the opposite party, the contestants of the will, had not examined all the witnesses they had called and sworn, and especially one Hugh F. Feeney, father of some of the defendants; that he was quite sure if he was put upon the stand it would have been a protracted examination, but, to his surprise, the defendants closed the examination, all except one witness, who was not present; that after waiting for a short time for this witness, the testimony for the defendants was closed, and one of the witnesses for the plaintiffs was put upon the stand, and the affiant immediately went with all

dispatch for a very important witness, a female, about three squares from the court-house, the witness and her infant child being indisposed, and that upon returning to the court-room, to his great surprise and disappointment, he learned that the testimony was closed. That the testimony which·he had ready was important to the issue. The affiant proceeded to give the substance of the evidence proposed to be given by this witness, and others.

Another ground of this motion was misconduct and want of qualification of one of the jurors, William M. Berryhill.

The deposition of Aaron Porter was taken, who testified that in May, prior to the trial of the issue, in a conversation with the juror, Berryhill, the latter said it "was no use for Mr. Thompson to law; it was not Mr. Steenrod's will, it was Mrs. Thompson's." In a second conversation with the juror, had on the 2d day of the trial, at recess at noon, the latter said that "Mr. Thompson would lose that trial," and that he saw Mr. Berryhill in the jury box on the trial. Berryhill said it was no use to keep men from their employment, but did not say why he thought Mr. Thompson would lose the trial.

Ezekiel Ball's deposition was, that in September of the preceeding year, Berryhill, who was the assessor of Ohio county, said, "they are going to break the Steenrod will. He said he thought it was right that it should be broken; that they would break the will, for Thompson had drawn the will himself; that he had been informed that Mrs. Thompson had informed her father how to make the will and that they would be able to prove that Thompson had drawn the will."

The deposition of Hettie Porter was that Berryhill said it was "no use for Mr. Thompson to sue, for he would get beat. He said it was not Mr. Steenrod's will, it was Mr. Thompson's will. This was in May 1866." Berryhill deposed that he was a juror on the trial; that he did not remember to have had any of the conversations with the foregoing parties, but may have had them, as the subject was frequently

talked about. That he had not made up or expressed any opinion before the trial, that he knew nothing about the case that he could put confidence in, until he heard the testimony; that he was on good terms with Mr. Thompson and wife, and did not know Mrs. Carter; that he had answered questions before being sworn, in the court, but did not remember whether he was sworn that he had not made up or expressed any opinion in respect to the validity of the will or not, before he was sworn in chief, but had answered all questions asked him at the time.

Another ground of the motion was, that the verdict was contrary to the evidence, but as this court declined to give any opinion on that question, it is not necessary to give the evidence here.

The plaintiffs in the issue, George W. Thompson and wife, and Emma B. Carter, brought the case here for review.

*Edmiston* and *Stanton* for the plaintiffs in error.
*Peck* and *Lamb* for the defendants in error.

MAXWELL, J. A bill was filed in the circuit court of Ohio county, to contest the validity of the will of Daniel Steenrod, deceased.

The court made an order that a jury should be empanneled at the bar of the said court, on the chancery side thereof, to ascertain and determine by their verdict the issue whether the testamentary papers admitted to probate in the said court, on the law side, at the May term thereof, 1864, as the will of Daniel Steenrod, deceased, late of Ohio county, be, or either, or any of them, be the will of the said Daniel Steenrod, deceased, or not.

A jury was accordingly empannelled and sworn well and truly to try the issue whether the testamentary papers admitted to probate in the said court on its law side, at its May term thereof, 1864, as the will of Daniel Steenrod, deceased, late of Ohio county, be, or any, or either of them, be the will of the said Daniel Steenrod, deceased, or not.

The jury found that "the papers before us, purporting to be the last will and testament and codicils thereof, of Daniel Steenrod, deceased, are not, nor is either of them, the last will and testament, and codicils thereof, of said Daniel Steenrod, deceased." The court rendered a decree in accordance with the verdict of the jury, from which an appeal has been taken to this court.

There are numerous bills of exception on the record, and four causes of error are assigned by the appellants in their petition.

The first cause of error assigned is that, the court erred in admitting the evidence set out in petitioner's first bill of exceptions. The petitioner's first bill of exceptions recites, "that on the trial of the issue in this cause, the defendants called as a witness Eliza Steenrod, and offered to prove by her that the testator, after the execution of the will, informed her that the Thompsons, meaning Geo. W. Thompson and Elizabeth his wife, a devisee in the will, did not want him to give anything to the children of Edward Steenrod, deceased, son of the testator; that this evidence was offered for the purpose of proving the declarations of the devisees; which evidence was objected to by the counsel for the plaintiffs in the issue, but the court overruled the objection and decided that the declarations. of any of the plaintiffs in the issue, was proper evidence, and admitted the evidence so offered to be given."

The ground on which this evidence was admitted, as stated by the court in the bill of exceptions was, that the declarations of any of the plaintiffs in the issue, was proper evidence. How far this statement is correct is not material to enquire, because the bill of exceptions does not disclose an effort to prove the declarations of any of the plaintiffs. It was an effort to prove that the Thompsons did not want the testator to give anything to the children of Edward Steenrod, deceased, son of the testator. How the Thompsons had manifested their wishes does not appear. There is no effort to prove their acts or declarations. It is simply an effort to prove the supposed fact by proving the declara-

tion of the testator made in respect to it.   This is hearsay evidence, and is clearly improper.   So far as it was intended to prove the acts, declarations or wishes of the Thompsons, or either of them, by proving the declaration of the testator, the court erred in its ruling.

It is claimed, however, that the evidence is proper to prove the declarations of the testator for the purpose of tending to prove that the will was procured to be executed by undue influence.

The authorities fully sustain the position, that such declarations are admissible in evidence, for the purpose of showing the state, condition and operations of the mind of the testator at the time of the execution of the will.   *Robinson* vs. *Hutchinson*, 26 Vt. Rep., 46; *Rambler* vs. *Tryon*, 7 S. & Rawle, 94; *Irish* vs. *Irish*, 8 S. & Rawle, 373; *McTaggart* vs. *Thompson*, 14 Penn. State Reports, 149; *Nelson* vs. *Oldfield*, 2 Vernon, 76; *Matthews* vs. *Warner*, 4 Ves. Jr., 186; *Pemberton* vs. *Pemberton*, 13 Ves. Jr., 290.

It was therefore proper that the evidence of the declarations of the testator should go to the jury, to be given by the jury such weight as they might see proper, for the purpose of showing the state, condition and operation of the mind of the testator, but for no other purpose.   This class of evidence is dangerous in its character, and is to be received with great caution.   The only legitimate purpose of this sort of evidence is to show a condition of mind in which its free agency may be easily overcome by the improper influences of those surrounding the testator, and to lay the foundation for the introduction of other and more direct testimony showing that such improper influences were in fact exerted.   The declarations themselves are no evidence that improper influences were exerted.

If the declarations of the testator had been proved for the purpose of showing the condition of his mind, such evidence would have been properly admitted.   But the bill of exceptions expressly negatives this idea, and certifies that the evidence was offered for the purpose of proving the declarations of the devisees, for which purpose, as before

stated, it was clearly improper and should not have been admitted.

The second cause of error assigned is, that the court erred in rejecting the evidence set out in petitioners' second bill of exceptions; and the third cause of error is the same as the second, only it applies to the third bill of exceptions.

The second and third bills of exceptions are substantially one and the same thing, but vary somewhat in form. It appears from bill of exceptions No. 2, that the testator had executed a codicil on the 25th day of January, 1864, which was in evidence before the jury, in which he stated that he had theretofore made his will, and a codicil thereto relating to his negroes, and especially to his servant Leann, in which he had bequeathed to her ten shares of the bank stock of the North-western Bank, and revoked the said bequest and bequeathed the said stock to another; that for the purpose of explaining the reference made in this codicil to the bequest to Leann, the propounders of the will and codicils offered to prove, and were allowed to prove by a witness, that the testator, after the date of the will in this controversy, in the presence of the witness, destroyed and caused to be destroyed by burning, a previous will and another paper not described by the witness.

The propounders of the will then asked the witness to state what was said by the testator at the time the said papers were destroyed, in reference to the nature of the said papers, and what they were; which was objected to, and the court sustained the objection. It was competent for the propounders of the will, for the purpose named in the bill of exceptions, to prove, if they could, that the testator had, before that time, made a will or codicil with the provision in it described in the codicil of January 25th, 1864. And it was competent for them to prove, as they did, as shown by this bill of exceptions, the destruction of the previous will. And it was also competent for them to have shown the destruction of a codicil, such as is described in the codicil of January 25th, 1864; but it was not competent for them

to show the destruction of any other paper, if it had been objected to by the other side.

The propounders of the will having proved the destruction of the will, as they had a right to do, and having proved it without objection from the other side, the destruction of the other paper referred to in the bill of exceptions, had proved an act of the testator pertinent to the inquiry before the jury, and were entitled to give evidence of the declarations of the testator made at the time of the act, in relation to the act as part of the *res gestæ* to go to the jury, to be considered by them for what they might be worth in their estimation. *Beckwith* vs. *Mollohan*, 2 W. Va. Rep., 483, and authorities there cited. The court, therefore, erred in refusing to allow the witness to answer the question asked him.

The fourth ground of error assigned is, that the court erred in overruling the petitioners' motion to set aside the said verdict and grant a new trial of the issue. It is claimed first, that the matters disclosed by the affidavit of George W. Thompson, showed such a surprise on the trial as should have appealed to the court to set aside the verdict or grant a new trial. It does not appear that the counsel for Thompson asked the court to wait for his return, or stated to the court that they desired to offer other evidence, nor does it appear but what the evidence was closed with their consent. I think the matter set up in this affidavit shows no ground for a new trial.

It is claimed secondly that the misconduct and want of proper qualification of the juror Berryhill, were good cause to set aside the verdict. The witness Aaron Porter testifies that he had a conversation with Berryhill, on the second day of the trial, at recess at noon, in which conversation Berryhill said Mr. Thompson would lose that trial. Berryhill himself says that he did not say anything to Porter, about Thompson losing the suit, during the trial or before. This places the oath of Berryhill against that of Porter, and disposes of the question as to the misconduct attributed to Berryhill during the trial.

This same witness, Porter, states that he had a conversation with Berryhill in the month of May preceding the trial, in which he says that Berryhill said "it was no use for Mr. Thompson to law,—it was not Mr. Steenrod's will, it was Mrs. Thompson's."

The witness Ezekiel Ball swears that he had a conversation with Berryhill, he thinks in September before the trial. He says that in that conversation Berryhill said, " They are going to break the Steenrod will." ˙ Witness told him that he did not know. Berryhill said he thought it was right that it should be broke. Witness told him it was a pity that they should go to law about it. Berryhill said they would break the will, for Thompson had drawn the will himself; Berryhill said he had been informed that Mrs. Thompson had informed her father how to make the will; Berryhill said that they would be able to prove that Thompson had drawn the will.

Mrs. Hettie Porter, another witness, says she had a conversation with Berryhill, she thinks in May. before the trial; she says that Berryhill said "it was no use for Thompson to sue, for he would get beat; it was not Mr. Steenrod's will, it was Mr. Thompson's will."

Berryhill says that he does not remember any of these conversations, but that he may have had them, as the subject was talked about considerably. He says he cannot say what was said to him, or what he said in reply. He further states that he had not made up or expressed an opinion before, or at the time he was sworn as a juror; that he knew nothing about the case that he could put any confidence in until he heard the testimony. Berryhill further states that at the time of the trial, he felt no bias against Judge Thompson, Mrs. Thompson, or Mrs. Carter. Upon this evidence, was Berryhill a competent and an impartial juror?

In the case of *Ramage* vs. *Ryan*, 23 E. C. L. Rep., 296, a rule was obtained to set aside the verdict of the jury on the ground that one of the jurors had come to the trial predetermined to give heavy damages against ˙the defen-

dant. The rule was supported by an affidavit of two members of the college of surgeons who were present at the trial of the cause of *Ramage* vs. *Wakley;* that at the conclusion of that trial, a person whose name was not then known to them, came up and expressed his surprise at the small amount of damages which had been given to the plaintiff in that cause, and at the same time said: "I shall be on the jury, to-morrow, and I will take care that the verdict does not go that way," or words of like effect; that one of the deponents then remarked, that the individual addressing them had not yet heard any evidence; to which the individual replied that "he had heard quite enough, and that his mind was made up as to the verdict he should give;" that on the following day the deponents were again respectively present in the court, and that when the cause of *Ramage* vs. *Ryan* was called for trial, the deponents saw the individual who had on the previous day made the before-mentioned remarks to them, sitting as a juror on the trial of that cause; that having reason to believe the individual in question was John Milton Hart, of Mornington Crescent, they went to his residence on the 31st of October, and having an interview, asked if he had been one of the jurymen on the trial of this cause; he said he admitted that he had; that he had conversed with the deponents at the door of Westminster Hall on the 25th of June, on the subject of the verdict in the cause of *Ramage* vs. *Wakley*, and recollected the remark he then made; that he supposed the deponents had come to him about a new trial in *Ramage* vs. *Ryan;* and that he knew something that would get a new trial, or words to that effect.

The affidavit of Hart was produced, in which the expressions alleged to have been used by Hart at his house, on the 31st of October, were altogether denied, and in which Hart explained the conversation in Westminster Hall, by deposing that his words were, "Well, I am surprised at such small damages; had I been upon the jury I certainly should have given very heavy damages. I am upon the jury to-morrow." That no other words escaped him, and that he

never said, "I will take care the verdict shall not go that way to-morrow." The four judges constituting the court, were unanimous in refusing a new trial.

In the case of the *Mayor &c. of Columbus* vs. *Gatchins,* 7 Georgia Reports, 143, the defendants moved to set aside the verdict of the jury for the plaintiff, on the ground, among others, that Cook, one of the jurymen, had formed and expressed an opinion in favor of the plaintiff, previous to the trial, which was unknown to the defendants or their attorneys.

In support of this ground the defendants introduced the affidavit of one Andrew P. Jones, who swore that on the morning before the trial, in a conversation with Cook, he remarked "that the city council ought to have removed Crawford away from Dr. Chipley's when he was first found there; that it was a long time before Crawford took the small-pox, and if he had been removed at once he would in all probability not have taken it at all."

The plaintiff, on the hearing, produced the affidavit of Cook, the juryman, who swore that the remark he made to Jones was a casual one founded upon rumor, and to the effect, "that if the council thought the negro would spread the small-pox, they ought to have put him off in the hospital;" that he had forgotten the conversation until re-called by the affidavit of Jones, and that in making up his verdict he was governed solely and exclusively by the evidence, under the charge of the court.

The court say, "This motion is supported by the affidavit of Jones, which does not establish any settled opinion entertained or expressed by the juror against the defendants, but all improper inferences which might possibly be drawn against the verdict from the statement of Jones, are fully rebutted and explained by the affidavit of the juror himself, in support of the verdict."

In *Taylor et al.* vs. *Greeley,* 3 Maine, 204, the defendant moved to set aside the verdict rendered for the plaintiffs, for alleged prejudice and partiality of one of the jurors. In support of the motion it was proved that to two different

persons the juror had declared a short time before the trial, that he knew all about the cause, and that the plaintiffs would and ought to recover; and that to another he said it would be a hard case for the plaintiffs if they should fail in the action. It was admitted, that at the trial, the defendant's counsel inquired of the juror whether he had formed any opinion upon the merits of the case; to which he gave satisfactory answers in the negative; and the counsel declined having him examined under oath. The juror himself deposed that he had no recollection of ever having used the language imputed to him, though he might have done so, and that when he went upon the pannel he was unbiased, unprejudiced and impartial. The court said that under the circumstances of this case, they could not sustain the motion. The defendant had not thought it necessary to have the juror interrogated under oath, as he might have done, but declined it, and was satisfied with his answers, reposing confidence in his integrity. The juror himself had sworn that he was impartial, and not under the influence of any impure motives, and the expressions he is said to have used may be explained and understood without any impeachment of his motives, and consistently with pure intentions and a desire to do justice.

In *Poores' case,* 2 Va. cases, 474, the prisoner was convicted of manslaughter and sentenced to two years imprisonment in the penitentiary. After the verdict, the prisoner moved for a new trial, and introduced three witnesses, all of whom proved that one of the jury who had found the verdict declared, a few days before the sitting of the court, that from what he had heard by flying report, if he should be on the jury, and the same should prove true, he should be for hanging the prisoner; they also stated that the juryman said he had been summoned to attend the court as a venireman, and hoped the prisoner would refuse to be tried by him. The juryman referred to was sworn before he was elected, and said that he had never heard the testimony on any former trial, nor had any person who did hear it, given him an account of what had been proved that he recollec-

ted; but that he had heard various accounts about it as rumored in the country; that notwithstanding anything he had heard, his mind was free, unbiased, and without prejudice either way, and that he felt no doubt but that he could give the prisoner a fair and impartial trial according to the evidence and law in the case, as the same should appear before him in court, without regard to anything he had heard out of court. The superior court refused to grant a new trial, and the general court unanimously refused to allow a writ of error.

The Virginia cases all sustain the principle with uniformity, that an opinion formed, must be deliberate and decided, to disqualify a juror. *Curran's case,* 7 Grattan, 619; *Kennedy's case,* 2 Va. Ca., 510; *Munford Smith's case,* 2 Va. Ca., 6; *Armstead's case,* 11 Leigh, 657; *Osiander's case,* 3 Leigh, 780.

I think, therefore, upon the authority of the cases cited, that the verdict cannot be set aside on account of the alleged partiality of the juror Berryhill.

And lastly, it is claimed that the verdict was plainly contrary to the evidence. We deem it improper to express any opinion on this point, as in the view we take of the case, it will have to be tried over again, before another jury. We are of the opinion, for the errors committed, as shown by bills of exceptions *one, two* and *three,* that the judgment of the court below must be reversed with costs to the appellants, the verdict of the jury set aside, and the cause remanded to the circuit court of Ohio county for a new trial to be had therein.

The other judges concurred.

JUDGMENT REVERSED.