NELLIE RICE, *et al.*

*v.*

GEORGIA L. HENDERSON, *et al.*

(No. 10658)

Submitted September 2, 1954. Decided October 19, 1954.

*George S. Wallace* and *George S. Wallace, Jr.,* for appellants.

*Duncan W. Daugherty* and *Duncan W. Daugherty, Jr.,* for appellees.

BROWNING, JUDGE:

Robert Floyd Ross, a bachelor, died June 26, 1949, leaving among his effects a paper in the following words and figures:

> "Huntington, 3, W. Va.
> "12-1-45
>
> "To All Whom it May Concern.
>
> "In case of my death please give my insurance and my money and everything that belongs to me to Georgia L. Henderson, for she is the only one on this earth that I want to have it.
>
> "Robert Floyd Ross."

This paper was enclosed in an envelope, on the back of which is inscribed:

> "Robert Floyd Ross.
> "Not to be opened until
> "My Death.
> "To all Whom
> "It May Concern."

Following the admission of such paper to probate, the plaintiffs herein, the brother and sister of decedent, brought this suit in equity against the defendants, Georgia L. Henderson and William H. Daniel, Administrator, c.t.a. of decedent's estate, and, on motion of the defendants, filed a bill of particulars asserting, in substance, that decedent did not sign the paper; that, if he did so, he lacked testamentary intent; that he lacked testamentary

capacity; and that Georgia L. Henderson had procured such writing by fraud, undue influence or coercion.

The case was tried to a jury on the issue of *devisavit vel non,* and the jury found that such paper was not the last true will and testament of Robert Floyd Ross. A motion to set aside the verdict was overruled, and the court entered judgment thereon, from which this Court granted an appeal on January 25, 1954.

The errors relied upon by the proponents are: (1) The verdict is contrary to the law and the evidence; (2) the court erred in not construing the paper writing in question, and instructing the jury of its legal effect, leaving to the jury only the questions: (a) whether it was in the handwriting of decedent and signed by him; (b) whether at the time of the execution of the paper decedent had sufficient mental capacity to execute a will; (c) and if he had such capacity, was his execution thereof induced by the undue influence of the proponent, Georgia L. Henderson; (3) the refusal of proponents Instructions Nos. 3, 9, 11, 12 and 13, and the giving of contestant's Instructions Nos. 5, 6, 7, 8 and 9; and (4) the admission of testimony by witnesses concerning the marital status of the proponent, Georgia L. Henderson, even though the court sustained proponents' motion to strike such testimony on the day following its introduction, and instructed the jury to disregard it.

The proponents of the will offered the testimony of a bank teller and others who, though unfamiliar with decedent's handwriting, were familiar with the signature as being that of decedent. There was no evidence offered indicating that the handwriting differed from the signature, and it must be assumed that the entire instrument was executed by the decedent in his own hand.

To comply with the burden of proving the testamentary capacity of the testator at the time of the execution of the alleged will, that burden being upon the proponents, they introduced several witnesses who had known the decedent between January, 1944 and the date of his death, June

26, 1949, who stated that he had such mental capacity. At least two stated that he had informed them that he wanted "Georgia", meaning Georgia L. Henderson, to have his property when he died, and did not want his brother or sister to have any of it. The proponents then rested, the court refused to direct a verdict on motion of the contestants, and the latter proceeded to offer testimony upon the issue of undue influence, the burden of so showing being upon the party who alleges the exercise of such influence upon an issue *devisavit vel non.* The proponents offered several witnesses in rebuttal.

The record discloses that Robert Floyd Ross was approximately fifty-one years of age at the time of his death in 1949. From the time he was discharged from service, shortly after World War I, until he secured employment at the Chesapeake & Ohio Railway Company shops in Huntington on January 18, 1944, he lived with his sister, the contestant Nellie Rice, as a permanent guest, but temporarily visited other relatives and other people in Cabell County, and in the states of Ohio and Kentucky. There is little, if any, evidence indicating that Ross ever held a steady job during this period of time, and witnesses for the contestants of the will use such phrases as "not normal", "never seemed like a stable minded man", "seemed in a fog", "all mixed up" and "didn't believe he knew what he was doing", in describing the decedent Ross. The witness Picklesimer was permitted to testify that Ross stayed with him at Greenup, Kentucky, for a period of approximately eight months "off and on" during the year 1934, and that Ross spent considerable time using a mineral instrument in an effort to "hunt minerals, pots of money, and so forth". The witness stated that he would dig a hole on one side of a tree, go to Huntington to consult someone when he found nothing, and would return to dig a hole elsewhere near the tree. Witness also stated that Ross told him on one occasion that "I am bewitched and I can't do nothing until I get shut of this witch." Other witnesses testified to the eccentricity of decedent, but only Basil Vernatter, Inez Rice, daughter-in-law of

the plaintiff Nellie Rice, and contestants would state specifically that they did not believe Ross mentally capable of executing a will on December 1, 1945. Neither of these three witnesses could recall seeing him on that exact date, however, and their association with him immediately prior to that time was obviously of a very casual nature.

For the proponents, upon the question of mental capacity, several witnesses, including Mr. and Mrs. Gothard, with whom Ross was living at the time he executed the alleged will, testified that he was mentally capable, using such phrases as "he was a man of firm will", "he was a pretty shrewd man", in describing the decedent. It was shown also, without contradiction, that Ross received an injury while employed at the shops of the railway company on February 14, 1948, resulting in the loss of a leg, for which disability he received a substantial amount of money in a lump sum. The record does not disclose the exact amount. Thereafter, he purchased a house and lot on Artisan Avenue in the City of Huntington, for which he paid cash. After living at that address for some time, he communicated with his real estate agent, informed him that the neighborhood was too noisy, and bought a more suitable place on 7th Avenue in the same city. He maintained a bank account at the Twentieth Street Bank in Huntington, and, as far as the evidence shows, conducted his financial affairs wisely, with the exception of a loan which he made to a former fellow employee at the shops, which was never repaid, in the sum of $180.00. This man testified for the contestants of the will upon the question of the decedent's mental capacity.

The evidence offered by contestants as to undue influence is vague and inconclusive. In the statement of particulars, it is stated that they expected to prove that Georgia L. Henderson practiced witchery and fortune-telling on Ross, by the use of such practices and trickery poisoned his mind against his legal heirs, and persuaded him to believe that the "spirits" dictated that he should give his property to her. Counsel for contestants indicated

by questioning of witnesses and statements during the trial that Ross was influenced to bequeath and devise his property to Georgia L. Henderson by her promise, later broken, to marry him. There was no evidence whatever to sustain the latter contention, and, while there was some testimony indicating that the decedent gave some credence to witchcraft and fortunetelling, there was no evidence to connect Georgia L. Henderson with any such practices upon the decedent, although there was testimony to the effect that Ross had made the statement that she "could tell him when he was going to be sick." The contestants lay considerable stress upon the fact that decedent, during his last sickness, kept under his bed and regularly partook thereof, a container filled with a concoction known as "seven bark." The witness Homer King stated that seven bark was an herb which he had procured on a nearby mountain for Ross, and that the "medicine" m⌐de from it was not only harmless, but very healing indeed. He stated that "seven bark is to take the swelling out of you. You take and you drink it by the glass. It won't hurt you. I have drunk many of it."

The verdict of the jury, to the effect that the paper writing of December 1, 1945, was not the last will of Robert Floyd Ross, does not, and is not required to indicate upon which of the factual questions it was based. It must be treated as if the jury found against the proponents of the will upon all questions properly presented to it. They could have found against the proponents upon the question of mental capacity, undue influence or lack of *animus testandi* by the alleged testator at the time the document was written and signed.

It has been long established in this jurisdiction that upon a trial of an issue *devisavit vel non*, in a suit to impeach a will, the burden of proving the testamentary capacity of the testator, at the time of the execution of the will, is upon the proponent of the will, and the burden of showing undue influence is upon the contestant. *Ritz, et al.* v. *Kingdon, et al.* 139 W. Va. 189, 79 S. E. 2d. 123;

*Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493. It is likewise established by those decisions, and others, that upon an issue *devisavit vel non,* under Section 11, Article 5, Chapter 41, Code, 1931, as distinguished from an issue out of chancery, the verdict of a jury is not merely advisory, but has all the characteristics of a verdict rendered in an action at law; and, if the verdict of the jury is sustained by the evidence, and no error of law occurs upon the trial, such verdict is binding upon the trial chancellor. However, upon a trial by a jury of such an issue, the court may, when proper, as in an action at law, set aside a verdict which is without evidence to support it, or is against the clear preponderance of conflicting evidence.

It is not necessary to discuss in detail the application of the facts in this case to the applicable law in this State on the questions of mental capacity and undue influence, inasmuch as the decision of the Court is unanimous upon the question of the *animus testandi* of the decedent, the Court holding that there was sufficient evidence to sustain the verdict upon that issue alone. This Court finds insufficient evidence to sustain the allegation of undue influence, and is divided upon the question of mental capacity. A minority of the Court, including the writer of this opinion, believes that the proponents of the will successfully bore the burden of showing mental capacity in the decedent, on December 1, 1945, to make a will. Point 11 of the syllabus in *Ritz, et al.* v. *Kingdon, et al., supra,* quoting from Pt. 2, Syllabus, *Nicholas* v. *Kershner,* 20 W. Va. 251, is as follows: "It is not necessary that a person should possess the highest qualities of mind in order to make a will nor that he should have the same strength of mind which he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life; but it is sufficient, if he understand the nature of the business in which he is engaged, has a recollection of the property which he means to dispose of, the objects of his bounty,

and the manner in which he wishes to distribute it among them."

The following statement in 57 Am. Jur., Wills, §86, and the cases cited in the footnotes supporting it, are interesting as applied to the evidence in the instant case: "* * * A testator's belief that he was saved from harm on several occasions by a guiding spirit does not establish insane delusions on his part. Indeed, it seems to be the settled law that testamentary capacity cannot be determined alone by what one believes, nor by the character of the tales he tells concerning spirits, spooks, and supernatural things. Even a belief in witchcraft is not necessarily conclusive evidence of insanity."

While it is not essential that a testator should intend to make a will, or be aware that he has performed the testamentary act, as was held by this Court in *Langfitt v. Langfitt,* 108 W. Va. 466, 151 S. E. 715, it must appear that the paper writing, whatever its form, was written *animo testandi.* The writing must have been designed by the maker as an actual disposition of property to take effect after his death, and not merely as an expression of what he expected to do or desired that others should do. That the instrument in question here was in the proper form for a valid holographic will, under the law of this jurisdiction, is evident. The proponents contend that the testamentary character of the instrument was so evident that the trial court, as a matter of law, should have held that it was the last will of the decedent, and that it was error for that question to be submitted to the jury as one of fact upon the issue of *devisavit vel non.* At the time of decedent's death, he owned real estate of a substantial value. As of the date of the execution of this instrument, he owned no real property, and only a small amount of personal property, but was insured under a group policy which, at his death, would have paid his designated beneficiary the sum of $1,000.00. He had designated his sister, the plaintiff Nellie Rice, as his beneficiary, and could not have substituted Georgia L. Henderson as such

beneficiary because the policy required that such beneficiary have an insurable interest in his life, which Georgia L. Henderson did not possess. Furthermore, the language used in this instrument "please give my insurance and my money and everything that belongs to me to Georgia L. Henderson * * *.", rather than the words "I give" or "I devise and bequeath", creates an ambiguity such as to require a determination of the doubtful purport of the instrument in respect of the intent of the decedent to make a testamentary disposition of his property. It was not error, therefore, for the trial court to submit to the jury, as a factual question, whether the instrument was written *animo testandi.*

Two witnesses testified as to the declarations of the decedent that are pertinent upon the question of *animus testandi.* Joe S. Hite, a witness for the contestants of the will, in answer to the question "Did Floyd Ross ever make any reference to a paper that he had in his trunk?", answered as follows: "He discussed with me at one time while he lived on Artisan Avenue, a few weeks after I sold him that property, the possibility of my writing him a will, because he had the feeling that he wouldn't get well, and he wanted to know what he should do. I said he should have a will written. And he said 'Will you write it?' 'No,' I said, 'I am not the man to write that. An attorney should write a will for you, because I might make 2 or 3 words wrong and construe the whole meaning of the will wrongly.' He said 'I have got a piece of paper in the bottom of the trunk and that is what I want done.' I said 'You had better have it put in the form of a will and properly prepared so that it can be executed.'"

These further questions were asked the witness Hite, and he made the following answers:

Q: "Did he say that on the paper he had written out he wanted a will made?"

A: "The way he said it to me was that 'I have a paper in the bottom of my trunk and that is what I want done.' Now that is what he said to me."

Q: "And did he state to you in words or substance that when he got able he wanted to write a will putting that into effect?"

A: "Upon my advice to do so he said 'That is another thing that I want to do when I get up and around.'"

Lillian Roberts, housekeeper for the decedent at the time of, and for several months prior to his death, upon direct examination was asked if Ross showed her the "will", and made any statement with reference to it, and stated: "He showed me these papers the next day after he come, moved over on Artisan Avenue. And he said 'If don't have another will made—don't get Joe Hite to make no other will—you see that Georgia gets these at my death.' And I thought no more about it. He put them in his trunk." The following further question was asked the witness Roberts, and she made the following answer:

Q: "Did Robert Floyd Ross at any time between the time you went to housekeeping with him until the time he gave you those papers say anything about who he wanted to have his property?"

A: "He said if he didn't make any other will he wanted it to stand just as he had it."

The admissibility of the evidence, relative to the declarations of the decedent, subsequent to the execution of the alleged will, is not before this Court. The evidence was not objected to, and the question has not been raised by counsel in briefs or argument. Nevertheless, the point will be discussed briefly. The authorities are in direct conflict on the question of whether extrinsic evidence is admissible to show that an instrument, which purports to be a will and is executed in accordance with all the statutory requirements of the particular jurisdiction, was intended to take effect as a will. One line of authorities supports the view that the presumption of testamentary intent which arises from the instrument is not conclusive, whereas the other line of authorities holds that the presumption of testamentary intent arising from the due

execution of the instrument is deemed conclusive, and that extrinsic evidence is inadmissible to disprove such intent. The authorities are also divided on the question of whether extrinsic evidence is admissible to show that an instrument, not on its face of a testamentary character, is, in fact, of such character so as to be entitled to probate, and to take effect as a will. However, "The courts agree that where an instrument not in the usual form of a will, being nondescript or in the form of some other instrument, is ambiguous or of doubtful purport in respect of testamentary disposition, extrinsic evidence is admissible to establish testamentary intent for the purpose of admitting the instrument to probate. * * *" 57 Am. Jur., Wills, §874. Upon the question of the admissibility of declarations of the testator to establish the testamentary character of an instrument, the following is quoted from 57 Am. Jur., Wills, §896:

"Since the courts agree that extrinsic evidence is admissible to establish testamentary intent in the execution of an instrument which is of ambiguous or of doubtful purport in respect of intent to make a testamentary disposition of property, doubt arising from the words used in a letter as to whether the instrument was intended to constitute a testamentary disposition may permit the introduction in evidence of the testator's declarations to prove the existence or absence of testamentary intent in the execution of the instrument.

"The declarations of the testator may be inadmissible, even in a case where parol evidence generally is admissible, on the issue of testamentary intent, by reason of general rules of evidence. So far, however, as the hearsay rule is concerned, the courts are inclined to be liberal in admitting the declarations of the testator as evidence on the issue of testamentary character of the instrument propounded, either on the theory that they are not hearsay in evidencing the intent or state of mind of the testator, or that an exception should be made to the hearsay rule to permit them to be received in evidence. According to some authority, the declarations of the maker of an instru-

ment propounded for probate, whether made before or after the execution of the instrument, are admissible in evidence to show whether or not he regarded it as a will. Other authority states that to prove by declarations of the testator that an instrument was intended as a will, the statements must have been made at the time the instrument was written, or, at least, must be shown to relate to the identical paper. A statement of a decedent which cannot be conceived as referring to an instrument propounded as his will is not admissible upon any theory that it is a demonstration which reveals his intent to make a testamentary disposition by the instrument."

In the case of *In re Kemp's Will,* Del., 186 Atl. 890, it was held that whether the maker of an instrument for which probate is sought, intended it as a will or an instrument of some other character, should, if possible, be determined from the face of the paper. Nevertheless, "the declarations of the maker, whether made before, at or after the execution of the instrument, may be received to show whether he did or did not regard it as a will. * * *"

In *Thompson, et al.* v. *Updegraff, et al.,* 3 W. Va. 629, the validity of a will was in issue. It was held that declarations of the testator, subsequent to the making of a will to the effect that a devisee did not wish him to give anything to certain grandchildren were admissible to lay a foundation for showing undue influence. In the opinion, the Court stated: "It was therefore proper that the evidence of the declarations of the testator should go to the jury, to be given by the jury such weight as they might see proper, for the purpose of showing the state, condition and operation of the mind of the testator, but for no other purpose. This class of evidence is dangerous in its character, and is to be received with great caution. The only legitimate purpose of this sort of evidence is to show a condition of mind in which its free agency may be easily overcome by the improper influences of those surrounding the testator, and to lay the foundation for the introduction of other and more direct testimony showing that such

improper influences were in fact exerted. The declarations themselves are no evidence that improper influences were exerted."

In *Couch* v. *Eastham, et al.*, 27 W. Va. 796, the second syllabus point is as follows: "Upon the trial of an issue *devisavit vel non* to set aside a will for mistake in the testator in executing it, declarations of the testator made *before* or *after* the execution of the will are inadmissible to prove the mistake." It is to be observed that in the *Thompson* case the will was attacked upon the ground of undue influence and in the *Couch* case upon the ground that the will was executed by mistake.

No case has been found in this jurisdiction involving the precise point discussed above. Generally, upon this question, see: Words and Phrases, Permanent Edition 3, Page 668; 19 Va. and W. Va. Digest, Wills, §165; Thompson on Wills, Third Edition, §333; Page on Wills 1, Chapter 4, §59; Rollison on Wills, §92.

Upon the verdict of the jury in this case, in finding that the paper writing in question was not the last will of the decedent, it must be presumed that they found that the words in the instrument were merely precatory, and chose to adopt the testimony of Hite, rather than that of the witness Roberts, as being true. Inasmuch as the instrument in question was ambiguous, and there was a conflict in the testimony relating to the declarations of the alleged testator, subsequent to the execution of the instrument, the question of whether this instrument was the last will and testament of the decedent became a factual one for jury determination. Since there is evidence to support the verdict of the jury, and it is not against the clear preponderance thereof, it was not error for the trial court to refuse to set it aside in the absence of error committed during the trial which was prejudicial to the proponents.

This Court finds no error in the giving and refusing of instructions by the trial court, each litigant in the case

having had his theory thereof fully presented to the jury. However, we desire to comment on contestants' Instruction. No. 5, given over the objection of the proponents, which is as follows: "The court instructs the jury that if they find there is an ambiguity in the paper writing and are unable to say whether the testator intended to give his property to Georgia L. Henderson or whether he was requesting whomsoever it concerned to give his property and insurance to the said Georgia L. Henderson, then a presumption that the testator did not intend to disinherit his heirs at law or next of kin, but intended that his property should go in accordance with the laws of descent and distribution, will be applied as an aid in construing the paper writing; and that the testator's heirs at law or next of kin will not be disinherited by mere conjecture but only by express words in the paper writing."

The construction of a will or other legal instrument is not within the province of a jury, and if this will required construction, it should have been done in a separate suit or action for that purpose. Therefore, the language in this instruction "will be applied as an aid in construing the paper writing" is disapproved. However, we believe from an examination of the entire instruction, as well as all of the others given, that the jury was not misled by the language used, and that it was not reversible error to give this instruction.

The testimony of the witnesses Vernatter, McAvoy and Howard as to the marital, and perhaps the extramarital, relationships of the proponent Georgia L. Henderson, was clearly inadmissible, particularly in view of the fact that the events occurred several years before the execution of the alleged will in this case. The error was cured, we find, by the sustaining of the trial court of a motion to exclude and to instruct the jury to not consider such testimony, though the granting of the motion to exclude, and the oral admonition to the jury, occurred on the day subsequent to the presentation of this testimony. It is

presumed that in considering the evidence in this case that the jury followed the instructions of the court that they should not consider this inadmissible testimony in arriving at their verdict.

The decree of the Circuit Court of Cabell County is affirmed.

*Affirmed.*