# CHARLESTON.

Sylvester Pickens *et als. v.* Garnet Pickens Wisman *et als.*

(No. 6063)

Submitted March 13, 1928. Decided October 16, 1928.

*A. D. Duduit* and *England* & *Ritchie,* for appellants.

*Hogg* & *Hogg,* and *Murray Briggs* and *B. J. Pettigrew,* for appellees Garnett Pickens Wisman and H. P. Brightwell, executor.

Litz, Judge:

Roman Pickens, a citizen and resident of Kanawha county, died December 1, 1922, survived by his widow, Mary F. Pickens, and his brothers and sisters, Cornelius Pickens, James Pickens, Mahala Summerville, Mrs. R. G. Mallory, Mrs. M. E. Harpold, Mrs. W. A. Maxwell and Mrs. Viola Kay. By paper writing purporting to be his last will and testament, dated April 14, 1922, he devised and bequeathed to the de-

fendant Garnet Pickens, who had lived in his family since birth, all of his estate (subject to the legal rights of his widow), appraised at $209,123.65, and consisting of farm and mineral lands, town property and various species of personalty.

This suit was instituted August 8, 1923, by Sylvester Pickens against Mary F. Pickens, Cornelius Pickens, James Pickens, Mahala Summerville, Mrs. R. G. Mallory, Mrs. M. E. Harpold, Mrs. E. A. Maxwell, Mrs. Viola Kay, Garnet Pickens and H. P. Brightwell, executor of the estate of Roman Pickens, deceased, to impeach the alleged will on the ground of incapacity of the testator, the bill being filed at September Rules, 1923. Upon the filing of the separate answer of Garnet Pickens, January 14, 1924, which showed numerous heirs at law of the decedent who were not parties to the suit, an order was entered requiring them to be made parties. At April Rules, 1924, an amended bill was filed in the names of Sylvester Pickens, James Pickens, and Mrs. M. E. Harpold against Garnet Pickens, Mary Pickens, widow of Roman Pickens, deceased, Cornelius Pickens, Mrs. R. G. Mallory, Mrs. E. A. Maxwell, Mrs. Viola P. Kay, O. C. Summerville, Frank W. Summerville, Warren G. Summerville, Oreth Summerville-Wool, Emma Williams, Mae Summerville-Uphoff, Robert Summerville, Hazel Summerville-Buck, Marian Summerville-McMullen, F. A. Martin, Charles Martin, Clyde Martin, R. U. Martin, Carrie Martin-Crumbaker, Bertha Martin, Seward Estel Medcalf, Mrs. Ida Frances Medcalf-Maxson, Frances M. Medcalf-Adams, Harvey Charles Medcalf, Ruth I. Medcalf-Kelbaugh, Florence E. Medcalf, Lillian E. Medcalf, Titus I. Medcalf, Derthi I. Singer-Hayes, Bernice I. Singer-McFarland, Frances S. Singer-Williamson, Florence B. Singer-Hautz, Ida M. Singer-Karl, Denver E. Singer, Clarence H. Singer, Laurel G. Hysell, Eugene J. Hysell, Claude Delmer Nease, Viola B. Nease-Wagner, Lester C. Nease, Virginia S. Nease-Brant, Euga M. Nease-Usler, Nevada S. Nease, and H. P. Brightwell, executor of the last will of Roman Pickens, deceased. On March 3, 1924, an order was entered reciting the appearance of the plaintiff, Sylvester Pickens, "as well also as the defendants M. E. Harpold, James Pick-

ens, by E. E. Robertson and Elmer L. Stone, their attorneys," stating that "the said Mrs. M. E. Harpold and James Pickens, defendants, moved the court to transpose them, the said defendants, Mrs. M. E. Harpold and James Pickens, as defendants in this cause to that of plaintiffs in this cause", and decreeing that "upon consideration of which and upon their motion the said defendants, Mrs. M. E. Harpold and James Pickens, are hereby made party plaintiffs to this cause." May 12, 1924, the defendants, Garnet Pickens and H. P. Brightwell, executor, filed their answer to the amended bill. On the same day an order was entered directing an issue *devisavit vel non,* which was tried by a jury May 9, 1924, resulting in a verdict in favor of the will. The appellants, Mrs. R. G. Mallory, O. C. Summerville, Frank W. Summerville, Warren G. Summerville, Oreth Summervill-Wool, Emma Williams, May Summerville-Uphoff, Robert Summerville, Hazel Summerville-Buck, Marian Summerville-McMullen, F. A. Martin, Clarence Martin, Clyde Martin, R. W. Martin, Carrie Martin-Crumbaker, Bertha Martin, Seward Estell-Medcalf, Mrs. Ida Frances Medcalf-Maxson, Frances Medcalf-Adams, Harvey Charles Medcalf, Ruth I. Medcalf-Kelbaugh, Florence E. Medcalf, Lillian E. Medcalf, Titus I. Medcalf, Derthi I. Singer-Hayes, Bernice I. Singer-McFarland, Florence S. Singer-Williamson, Florence B. Singer-Hautz, Ida M. Singer-Karl, Denver E. Singer, Clarence H. Singer, Laurel G. Hysell, Eugene J. Hysell, Claude Delmer Nease, Viola B. Nease-Wagner, Lester C. Nease, Virginia S. Nease-Brant, Euga M. Nease-Usler, Nevada S. Nease, James Pickens, Mattie Pickens, Wade Pickens, Herbert Pickens, Guy Pickens, Roman Pickens, Mabel Dodd and Owen Dodd, an infant, by Alexander Falconer, his guardian *ad litem,* non-residents, filed their petition May 5, 1926, under section 14, chapter 124, Code, asking for a rehearing, and on May 25, 1926, an order was entered again directing an issue *devisavit vel non* and permitting all of the appellants except James Pickens to make defense. On the trial of the issue, January 20, 1927, the jury again returned a verdict sustaining the will.

Many errors are assigned by the contestants to the rulings of the trial court, including those based upon the admission

and exclusion of evidence and the granting and refusal of instructions.

As the proponents of the will not only deny the validity of the errors assigned but insist that the jury could not have properly reached a different verdict, it is necessary to analyze the accepted and rejected evidence offered by the contestants as well as the evidence admitted on behalf of the proponents.

## EVIDENCE ADMITTED FOR THE CONTESTANTS

F. M. Priestly testifies that he knew Roman Pickens "something like fifty years", and was well acquainted with him during the latter part of his life. That at times "he seemed to be under the influence of liquor or something like that" when he "seemed to be more talkative. He would tell me things and then he would tell me the same thing over. Other times it was not that way. We always called it when he was on one of his drunks;" but that he never saw Roman attempt to transact business while drinking.

Charles Hensley says that he knew the testator about thirty-five years, but never observed "anything wrong with him."

John E. Pickens, who claims to be an illegitimate son of Roman Pickens, says that while he was riding horseback by the home of Roman Pickens in June, 1922, he had a conversation with his putative father, who was at the time standing in his yard some distaince from the road; that the testator did not at first recognize him, but did readily recognize the horse he was riding, it having been recently pastured on the farm of the testator for the owner, Jerry Smith; and that he does not think the testator was capable of transacting business.

J. H. Richardson, who knew Pickens seven or eight years, says he saw him on one of the principal streets of Charleston in June, 1922, without hat, collar or tie, in company with two other men; that Pickens was laboring under the false impression at the time that he owed the witness some money; and that he does not believe that Pickens was competent then to transact business.

C. H. Mallory, who claims to have been with the witness.

Richardson on the occasion testified to by the latter, says that Pickens was wearing a hat and did not present an unusual appearance in dress, but did seem nervous and excited.

J. R. Childress worked for Pickens twelve or fourteen years. Pickens told him four or five months before his death that he and two other men had bought the Union Trust Company in Charleston; that Pickens acted at the time like he was drunk; and that he got on a spree every two or three months.

J. D. Gray, who knew Pickens about fifty years, says he saw him in Charleston in May or June, 1922, when he seemed sick or "unstrung"; that it seemed he didn't want to talk except when addressed; and that 'I would not have thought he was at that time' capable mentally of transacting business.

Don S. Rock, who knew Pickens intimately thirty or forty years next prior to his death, says he was a good business man.

L. M. Massey, who knew the testator eighteen or twenty years, says that he saw him two or three times a month during the year 1921; that sometimes he was talkative, and that other times would not have much to say; that at times he thought Pickens was drunk or drinking.

Josh Allen, who knew Roman Pickens about eight years, says he talked with him in the fall of 1921; that he did not then carry on a connected conversation and looked wild at times; that he had never observed any peculiarities about the conduct or conversation of Pickens prior to that time.

W. E. Walter, an employee of the Chesapeake & Ohio Railway Company, says that he had a conversation with the testator some years prior to his death concerning a disputed boundary line between the properties of Pickens and the Railroad Company, in which Pickens contended that a railway switch had been located at a certain place, while, according to the recollection of the witness, there was never any switch at the location in question. On cross-examination, the witness admitted, however, that this was a controverted fact in certain litigation between Pickens and the Railway Company subsequently tried in the Federal Court.

J. W. Dunlap, who knew the testator about twenty-five

years, says that in a conversation with witness in 1921, Pickens referred to certain land he had previously sold to the Chesapeake & Ohio Railway Company as extending to a sycamore tree; and that in his testimony upon the trial of subsequent litigation between himself and the Railway Company, Pickens denied that such tree ever existed.

C. J. Bumpus, who knew Pickens since 1906, saw him last about April 1, 1922, at the corner of Capitol and Kanawha Streets in the City of Charleston; that after calling to the witness from across the street, Pickens turned abruptly, going into the Union Trust Bank; that Pickens "had a kind of a wild look" at the time, and that the witness does not think he was then capable of disposing of his property.

Mrs. Fred Glover, who had known the testator all her life, was at his home in August, 1922, when he was leaving for Charleston; that he did not know who she was until he was told so by his wife; and that he did not recognize her the next day when she saw him on Capitol Street in Charleston, but invited her to his home.

W. H. Kersey, who knew him about forty years, says that he saw the testator in the fall of 1921 or early spring of 1922, with a view of soliciting a donation for the erection of a church; that on this occasion he "talked so wild" that the witness "thought he was drinking"; that "his condition was such that I decided he did not know what he was doing" (he refused to donate, however); that on a subsequent occasion while he was in conversation with Pickens on the street in Charleston "all at once he stopped and just waved his hand toward the lower part of town, and said, 'Kersey, all this belongs to me, every bit of it'"; and that in his opinion the testator "was hardly competent for any business" on either occasion. From the context of the witness' testimony, it seems that Pickens was waiving his hand toward the Union Trust Company building.

W. L. Ramsey, who knew the testator thirty or forty years, observed nothing peculiar about his actions until on one occasion while he was with him on a street car going from Charleston to St. Albans when he would drift abruptly from one subject to another in his conversation and at times curse

some one he did not like; that in his opinion Pickens was not at the time capable of transacting business or disposing of his property by will. On cross-examination the witness admitted that the testator may have been drinking at the time, and that he was "given" to cursing people he did not like.

W. H. Turley, first knew the testator in 1874, but did not know much of him after 1879. In a conversation with him about a year before his death "he talked in a wild rattling way", and, in the opinion of the witness, acted more like a crazy man than one under the influence of intoxicants. Cross-examination of the witness: "Q. Because he asked you twice who you were, you think his mind was gone; A. I naturally supposed that it was. Q. And that is all you base it on; A. That is all I would have to base it on. Q. You do not know how liquor affected him during the ten years proceeding that time you had not seen him? A. No, in the ten years before that, for I didn't see him."

S. A. Parker, who saw the testator last in 1918 or 1920 says: "He seemed to be nervous all the time and didn't hold a conversation about anything the last two years I saw him." Cross-examination: "Q. You would not say he was not capable of transacting business, would you? A. I wouldn't have wanted him to transact any business for me at that time. Q. You would not say that he could not look after his own business and transact it? A. No, sir, I wouldn't say that."

L. V. Adkins, who saw the testator last in May or June, 1922, on the street car between Charleston and St Albans, .says that when he told Pickens his name, "he said a word or two and just turned off his head and wouldn't talk any more"; that he just seemed to sit with his head downwards and look out the window every once in a while and didn't have much to say"; that he had observed testator about five months before when he seemed not inclined to "talk on one subject very long".

J. W. Bragg, who first knew the testator in the early part of 1921, says he saw him once or twice a month thereafter, and talked with him several times the latter part of 1921 and in 1922, and that he "wouldn't have figured that he was

capable of disposing of large amounts of property by will or otherwise''.

## REJECTED EVIDENCE OFFERED BY CONTESTANTS.

The trial court excluded evidence offered by the contestants to show that the mother of Garnet Pickens was colored, and that three sisters and one brother of the testator had become insane. There was also excluded certain evidence offered for the purpose of contradicting a witness for the proponents and the testimony of a specialist on mental diseases to the effect that insane persons sometimes concealed their insanity and that very often trained persons in the care of insane persons cannot determine just what the symptoms of insanity are in persons by observation or brief examination.

## EVIDENCE ON BEHALF OF THE PROPONENTS

J. B. Gilmore, knew the testator since February, 1916, drilled gas wells for him from that date to 1921, saw him for a part of this period two or three times a month, and during the remainder once a month; was at the home of Pickens practically all day on his birthday, March 17, 1922. He says Pickens seemed mentally capable at the time and discussed a number of questions. Saw him during his last illness, in the late fall of 1922, and his mind and memory seemed to be sound. In 1916 Pickens told him he had given his relations all they would get of his estate.

Elvin Williams, knew the testator since 1884, had business transactions with him from time to time until 1922, and saw him last in October of that year. Pickens told him before the date of the will that he intended to give his property to Garnett Pickens and after that date told him that he had done so; that his mental capacity was as good as anyone he knew.

Joseph W. Stephens, a subscribing witness to the will, stated that he had lived fifty or seventy-five yards from the testator since 1910, and had often visited his home especially when he was sick; never observed any mental weakness on his part; and Pickens had told the witness before the will that he intended to give his property to Garnett Pickens.

J. W. Smith, who was employed by the testator from 1914 until his death as overseer of his lands, says that he talked with Pickens almost daily from March 1922 to the time of his death and observed no difference in his ability to attend to his affairs.

Ella Sue Sanger (a graduate nurse) who attended the testator for ten days in February, 1922, while he was suffering from a light attack of pneumonia, says that when she reported for duty he introduced Garnett Pickens to her as his daughter; and that in her opinion he was, during the whole time, "absolutely clear mentally." She states further that in her previous experience of nine years she had nursed a number of persons of unsound mind.

W. W. Smoot knew the testator about twenty-two years, and had business relations with him, from 1908 to the time of his death, in the purchase from him of rights-of-way and timber, and the development of coal property belonging to him. The contract for the development of the coal property, entered into between the witness and Pickens in July, 1922, provided for the payment of the expenses of opening and developing the mines which were to be operated on the basis of partnership between them. Smoot submitted at the end of each month to the testator, who kept in touch with the work, a report of expenditures which was carefully considered by Pickens before approving it. The witness states that "he considered Mr. Pickens a man of a little over an average intellect and a man that was a good business man, a safe business man, and at all times competent to take care of business, except at the times when he had been under the influence of whiskey."

Dr. Hugh G. Nicholson, practicing physician of Charleston, who attended the testator during his illness in February, 1922, and his last illness in the late fall of that year, says that the testator came to the office of the witness for treatment or consultation every month or six weeks for a year before his death; that the witness talked with Pickens on the first visit thirty or thirty-five minutes, and on the other occasions ten to fifteen minutes. Dr. Nicholson further says that he never saw anything indicating mental weakness on the part of

Pickens until two weeks before his death; and that prior to this time, Pickens was, during the period of the witness' acquaintance with him, able to transact business.

Joe Perry, lived within a mile of Pickens and saw him every few days for twenty-five years. He states that he never observed anything to indicate that Pickens was not able to transact the ordinary business affairs of life; that he heard him say several years before his death that his property would belong to Garnett Pickens after his death.

A. H. Lambert, became acquainted with the testator in 1897 or 1898, lived as a tenant on the home farm of Pickens twelve or thirteen years, and was intimately acquainted with him until his death; he visited Pickens while he was sick in February, 1922; on this occasion Pickens discussed his business affairs as usual; and he had heard Pickens state that he intended to give his property to Garnett Pickens.

W. O. Abney, President of Union Trust Company, a banking institution of Charleston, having an authorized capital stock of $500,000.00 and $100,000.00 surplus, says he knew Pickens intimately since the organization of the company May 5, 1913; that Pickens owned 380 shares of the stock and was a large stockholder and director of the bank from its organization to the time of his death; that he attended and participated in most of the directors meetings during the years of 1921 and 1922, the actual number as disclosed by the minutes of the meetings being nineteen in 1921 and fourteen in 1922; and that he displayed "a great deal more mind than the average man" in the business of these meetings

A. B. Koontz, Vice President and a director of the Union Trust Company, says that Pickens attended the meetings of the board of directors more regularly "than most members of the board"; and that he saw no material change in the mental capacity of Pickens from his first acquaintance with him in 1911 to the last time he saw him at a directors' meeting, October 10, 1922.

J. A. Allen, knew testator more than forty years, acting as his agent in renting houses and caring for timber belonging to Pickens for eight years next prior to his death; was with

him on an average of once a month during this period, and never saw him when he was unable to transact business.

John R. Skinner, knew Pickens since about 1902, negotiated with him in December, 1921, for the purchase of mineral lands, and always regarded him as an extremely shrewd business man.

Ira Sayre, who has been engaged in the oil and gas business in Kanawha, Boone and Fayette counties for twelve or fifteen years, knew the testator about thirty years; had many business transactions with him, the last being on March 31, 1922, when he purchased the gas being produced from certain gas wells operated by Pickens; he discussed three or four times during the summer of 1922 the condition of these wells and other matters; and never observed anything in the conduct or conversation of the testator indicating that he was not competent to attend to his business affairs.

Doctor Ward Harshberger, who lives at St. Albans, consulted the testator in July, 1922, concerning oil wells in which the witness was interested, at which time his mind "seemed to be very accurate."

Numerous other witnesses, with reasonable and substantial basis for their opinion, testify to the competency of the testator. The evidence of incompetency, it will be observed, is not only based more or less on casual conversation or observation, but the alleged incompetency is confined almost entirely to dates subsequent to the execution of the will. This evidence is not only met by the testimony of physicians, the scribner and subscribing witnesses to the will, and other persons who dealt with the testator in business, but is wholly overthrown by the uncontradicted evidence showing that he attended to his extensive business affairs, including the duties as a director of a large banking institution until a short while before his death; and there is no claim whatever that at any time during his whole life he ever entered into an unwise business undertaking. The theory that the testator was incompetent to transact business is, therefore, without weight in the face of the actual fact that he did conduct his large and diversified business in a wise and judicious manner. The substantial business acts rather than the conversations or occasional do-

ings of the testator, not connected with business, must be looked to in determining his mental capacity. This is necessarily true for the reason that his capacity to do business is the question under consideration. The alleged peculiar conduct of the testator testified to by the witnesses for the contestants is, according to the record, fairly attributable to intoxication or the infirmities of old age.

Whether the mother of a beneficiary was of negro blood, or the testator was, in fact, the illegitimate father, she was reared and treated by him as his own child, and he had often expressed his purpose to give her his estate.

In a suit to annul a will on the ground of mental incapacity of the testator, the true test of his mentality is to be determined as of the time the will was made and executed, and it must affirmatively appear that he did not then have mind sufficient to understand the nature and consequences of his act, the property to be disposed of and the objects of his bounty. *Payne* v. *Payne*, 97 W. Va. 627.

Being of opinion that the jury could not have properly reached a different verdict had the rejected evidence offered by the contestants been accepted, the decree of the circuit court will be affirmed.

*Affirmed.*