**STATE OF WEST VIRGINIA**

Stephen M. Hood,
Plaintiff Below,
Petitioner.

**FILED**

**November 3, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

vs.)  No. 22-0214 (Cabell County 15-C-546)

Linda Hood, individually, and as the
Executrix of the Estate of Dorothy Hood and as the
Executrix of the Estate of Jeffrey E. Hood,
Defendants Below,
Respondents.

## MEMORANDUM DECISION

In this will contest, Petitioner, Stephen M. Hood ("Stephen"),[1] by his counsel, Mark W. Kelley and John J. Brewster, appeals the Circuit Court of Cabell County's award of summary judgment to Respondents,[2] appearing by their counsel, William M. Mundy and Leon K. Oxley, finding that there was no genuine issue of material fact that Dorothy A. Hood ("Dorothy") had testamentary capacity to execute her September 7, 2007 will.  Stephen argues that the circuit court erred by finding there was no genuine issue of material fact as to whether Dorothy had testamentary capacity at the time the will was executed.  Stephen also appeals the circuit court's award of summary judgment to

---

[1] Due to the fact that many of the people involved with this matter share the same last name, Hood, we identify them solely by their first name in this memorandum decision.  Stephen is also known as "Sam" but will be referred to herein as "Stephen."

[2] Below, Respondents were Jeffrey E. Hood, individually and in his capacity as Executor of the Estate of Dorothy Hood, and Linda Hood.  During the pendency of this appeal, Jeffrey E. Hood passed away.  On April 5, 2023, this Court remanded this matter to the circuit court for the limited purpose of appointing an Executor for the Estate of Dorothy Hood.

On September 6, 2023, the circuit court entered an order appointing Linda Hood as Executrix of the Estate of Dorothy Hood.  At the time of her appointment, Linda Hood was already serving as Executrix of the Estate of Jeffrey E. Hood.  Thus, because the events giving rise to the allegations in the complaint arose prior to the death of Jeffrey E. Hood and all current Respondents are successors in interest to the original Respondents, the term "Respondents" refers collectively to both iterations of the named Respondents.  "Jeffrey" refers to Jeffrey E. Hood.

1

Respondents based upon its finding that there were no genuine issues of material fact on the issues of undue influence and tortious interference with a testamentary bequest. Following oral argument on October 11, 2023, we conclude there are, in fact, issues of material fact and the circuit court erred in granting summary judgment.

This Court has considered the parties' briefs, the record on appeal, and the oral argument of the parties. From that review, the Court finds that the circuit court erred in granting summary judgment to Respondents. Accordingly, this case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is appropriate for reversal and remand by memorandum decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Will

Dorothy died testate on July 20, 2013. She had two children, Stephen and Jeffrey. On September 7, 2007, she signed a simple will that stated, in full:

Last Will and Testament
of
Dorothy A. Hood

BE IT REMEMBERED, that I, Dorothy A. Hood, now residing in the City of Huntington, County of Cabell, West Virginia, do make and publish this my Last Will and Testament and do hereby revoke any and all wills and codicils heretofore made by me.

Article I
I direct that all my just debts and funeral expenses, including the expenses of the administration of my estate, be paid by my executor hereinafter named. I further direct that these sums shall be paid and discharged as soon after my death as is practicable.

Article II
All the rest, residue and remainder of my estate of every kind and nature, both real and personal, which I may own or have the right to dispose of at the time of my death, I give, devise and bequeath unto my son, Jeffrey E. Hood. I have intentionally left nothing to my son Stephen M. (Sam) Hood, knowing he was well provided for during my lifetime.

2

s/ Dorothy A. Hood
Dorothy A. Hood

[end of page one]

Article III

I hereby appoint my son, Jeffrey E. Hood, as executor of my will and request that he be permitted to qualify without bond.

IN WITNESS THEREOF, I have hereunto set my hand this 7th day of Sept., 2007 to this my will written upon two sheets of paper, upon each of which I have signed my name.

s/Dorothy A. Hood

Dorothy A. Hood

[end of page two]

This will was signed by Dorothy as well as two witnesses, Paul T. Farrell ("Farrell") and Neisha E. Brown ("Brown"). Farrell prepared the will and Brown was an associate at Farrell's law firm. A self-authenticating affidavit was attached to the will, also signed by Farrell and Brown, and their signatures were notarized by Terrie L. McMahon, now Terrie McMahon Snow ("Snow"). The affidavit contained this language:

> Dorothy A. Hood, being of lawful age, in the joint presence of the affiants, signed, published and declared the same to be her Last Will and Testament and that they, believing the said Dorothy A. Hood to be of sound and depositing mind and memory, at her request and in her presence, and in the presence of each other, subscribe their names hereto….

Dorothy had two prior wills, both of which divided Dorothy's estate equally between Stephen and Jeffrey. The revocation of "any and all wills and codicils" contained in the September 7, 2007 will disinherited Stephen, with the will stating such was because Stephen "was well provided for during my lifetime."

## B.     The Will Contest

Stephen filed the underlying action to challenge the validity of the will. In his complaint, Stephen raised the following grounds for relief: 1) Dorothy lacked testamentary capacity to make the September 7, 2007 will; 2) The will was executed while Dorothy was subject to undue influence; 3) Stephen expected to receive an inheritance from Dorothy, which was interfered with by Jeffrey and Respondents; 4) Respondents engaged in a civil conspiracy to deprive Stephen of his inheritance; and, 5) Respondents

3

converted estate assets to themselves. The first three of these grounds are at issue in this appeal.[3]

During the course of the litigation, both Stephen and Respondents filed motions for summary judgment.[4] The circuit court granted Respondents' motion for summary judgment, finding there was no genuine issue of material fact on all issues. As we believe the circuit court erred in granting summary judgment because there are genuine issues of material fact, we will set forth the basis of such factual questions.

By 2006, Dorothy's friends and family noted she was showing signs of dementia. William Burdette, Jr. ("Burdette") was a thirty-year employee of West Virginia Electric[5] who testified about a time when Dorothy came into West Virginia Electric in 2006 or 2007 to purchase lightbulbs and thereafter could not remember how to get home. David Hager ("Hager")[6] provided an affidavit stating that he witnessed Dorothy's mental health deteriorate beginning in 2004, following Marshall's death. He averred that by September 2007, Dorothy could only respond to questions with short replies, which was unusual for her. He further swore in his affidavit about an incident in which Dorothy forgot that Hager's mother had to have her legs amputated. Ann Justice ("Justice") signed an affidavit that stated Dorothy's mental state gradually declined after Marshall's death in 2004. In one incident, Justice and Dorothy were attending church in Huntington when, following the service, Dorothy asked Justice "if the service was about to begin, or if it had ended." Another witness, Taylor Hood (Stephen's son and Dorothy's grandson), testified that in 2006, Dorothy had someone else writing her checks and paying her bills. Additionally, Stephen testified that he visited Dorothy on either September 6 or 7, 2007, and he observed Dorothy looking through trash cans in the garage for Marshall's nail clippers. As she searched for them, she said it was because "[h]e needs his nail clippers.

---

[3] There were multiple complaints filed in multiple civil actions below, which were ultimately consolidated into the present civil action. The five grounds stated here were the only grounds remaining. Stephen did not appeal the circuit court's grant of summary judgment on the civil conspiracy and conversion grounds.

[4] Stephen sought partial summary judgment on the ground that Dorothy was under an insane delusion that defeated testamentary capacity, while Respondents moved for complete summary judgment.

[5] For many years, West Virginia Electric was the Hood family's main business. Dorothy's husband, Marshall Hood ("Marshall"), founded the business. Dorothy, Stephen, and Jeffrey all worked in this business at various times.

[6] Respondents spell this name as David Hagar. Because his affidavit in the record spells his name "Hager," we will use that spelling.

4

He wants his nail clippers, and I threw them away," though Marshall had been deceased for some time.

Additionally, evidence from Dorothy's medical providers showed signs of onset of dementia as early as 2006. In a record dated October 12, 2006, from Cabell Huntington Hospital's Regional Pain Management Center, Dr. Ahmet Ozturk noted that "[t]he patient reports problems with falling asleep, waking tired in the morning, daytime fatigue, feeling sleepy during the day, and being forgetful of the little things." The chart from that visit also notes that Dorothy reported that both of her parents died of cancer, which statement was apparently not true.

On July 26, 2007, six weeks prior to the execution of Dorothy's will, she presented at the St. Mary's Medical Center Emergency Department with an "abrupt onset of neck pain." Dr. Chadwick Smith noted at that time that:

> She cannot really tell me much more other than she has this left-sided neck pain. She does not know how long it lasted but she does know that it bothered her and then it radiated down into her left chest and actually down into the left hip. She believes that she may have some coronary artery disease. She is not certain. She knows that she does have a pacemaker. *Just from my initial interview with this patient I believe that she does have some underlying dementia which is present. She repetitively ask [sic] me my name and the situation. It makes her history extremely limited. She cannot tell me what the pain feels like just that it hurts. She cannot tell me if it is worse with exertion or better with rest. She cannot really provide me with much further history other than that she did have this pain.* She is still having some persistent left sided chest pain. The patient has a pacemaker in place making interpretation of her EKG difficult. She does have an underlying conduction delay secondary to the pacer. I do not have an old paced EKG for comparison. *No further history is obtained secondary to her dementia.*

(emphasis added).

Dr. Kevin Yingling was Dorothy's primary care physician. He noted in his charts on November 10, 2006, and on March 9, 2007, that Dorothy was "neuro abnormal." In a note made in Dorothy's chart on June 6, 2007, Dr. Yingling's nurse noted that the nurse "ret[urned] call to p[atien]t. P[atien]t very confused about calling office. P[atien]t stated she did not want to call us." However, during a July 9, 2007, visit with Dr. Yingling, he found Dorothy to be in her usual state of health and mental competence. Five days after

5

executing her will, on September 12, 2007, Dorothy was seen by Drs. Ataro and Elbash. They noted Dorothy was "alert" and "oriented to time, place, and person." Dr. Yingling saw Dorothy on September 20, 2007, and made similar notations in his records.[7] During this visit, Dr. Yingling and Dorothy discussed her current living arrangements. She indicated she "wants to sell the house" and they discussed Dorothy potentially moving into a retirement facility. During the course of this litigation, Dr. Yingling submitted an affidavit stating:

> That it is my opinion to a reasonable degree of medical certainty that in September 2007, Dorothy Hood had the requisite cognitive capacity to consent to medical procedures, conduct her business, including executing a will, as her cognitive capacity was appropriate to make informed decisions for an 88-year-old individual.

In another medical record, where Dorothy was admitted to St. Mary's Medical Center from December 3, 2007, to December 6, 2007, it was noted that Dorothy "has poor short term memory" and was "disoriented as to place and time. Repeatedly asks why the nursing staff is here and what is going on." A month later, on January 13, 2008, Cabell County EMS was dispatched to Dorothy's home and found Dorothy responsive on the floor, unable to get up. After being assisted to her feet, Dorothy refused transportation to the hospital and signed a release from responsibility. She signed the waiver as "Dorothy Adkins," her maiden name.

In support of his motion for summary judgment, Stephen offered an expert report. The opinions in this report, prepared by Dr. Bobby Miller ("Dr. Miller"),[8] a Board-

---

[7] One of the statements in Hager's affidavit was that Jeffrey told Dr. Yingling at a "mid-September 2007" visit that Dorothy "was exhibiting odd behavior and that her mental condition was deteriorating."

[8] During the pendency of this matter, Dr. Miller passed away and was replaced by Dr. David Clayman as Stephen's expert witness. Dr. Clayman opined that he "found numerous instances that call into serious question [Dorothy's] executive function capabilities, such as the ability to make and understand a will" and that:

> [T]he majority of the medical records, together with the affidavits and depositions of the lay collaterals, when examined concurrently with the scientific literature on dementia in a balanced manner, are strongly suggestive of [Dorothy] suffering from large functional deficits resulting from cognitive impairment as early as August 2006.

6

Certified Neuropsychiatrist and Forensic Psychiatrist found, to a reasonable degree of medical certainty, that "Dorothy Hood, by virtue of her evolving dementia, lacked the testamentary capacity to enter into her will dated 9/7/2007…." On its face, the report stated that Dr. Miller had reviewed the following documents: [9]

      1. Last Will and Testament of Dorothy A. Hood.
      2. Medical Records from Cabell Huntington Hospital
      3. Medical Records from St. Mary's Medical Center
      4. Medical Records from Kevin Yingling, M.D.
      5. Medical Records from Charles Meadows, M.D.
      6. Medical Records from Terrence Triplett, M.D.
      7. Second Amended Complaint
      8. Physician's/Medical Examiner's Certificate of Death
      9. Determinations of Incapacity Form
      10. Affidavits
      11. Deposition of Ortrud Vallejos
      12. Deposition of Judge Paul Farrell
      13. Purchase of Huntington Piping, Inc. Exhibit A

In addition to the testimony of friends and family and the medical testimony, circumstantial evidence was adduced that Jeffrey provided information to his mother that he arguably knew was false regarding the disposition of family property. Stephen maintains that Jeffrey provided a list of assets to his mother that incorrectly indicated that Stephen had previously received over 1.2 million dollars in assets.[10] Nonetheless, Jeffrey testified

---

[9] The circuit court found that Dr. Miller's report "does not appear to based upon personal observations, or upon any of the medical records or affidavits presented to the Court, and is therefore not sufficient to create a genuine issue of fact[.]" All of the records cited in Dr. Miller's report were provided to the circuit court by letter from Stephen's counsel dated June 7, 2018, in response to the "medical timeline" submitted by Respondents. This finding is not supported by the evidence.

[10] This list of assets is a typed document with hand-written notations. The typed portion of the document states:

SUMMATION OF VALUES

| Property | Land | Improvements | Total |
|---|---|---|---|
| 1. 213-215 Third Ave. | $47,000 | $188,000 | $235,000 |
| 2. 217-219 Third Ave. | 47,000 | 160,000 | 207,000 |

(continued . . .)

7

he never discussed Dorothy's will with her and never gave a list of assets to Dorothy but Dorothy gave the list to Jeffrey. In part, the perceived disposition of the assets on this list

| | | | |
|---|---|---|---|
| 3. 221-225 Third Ave. | 56,200 | 37,800 | 94,000 |
| 4. 240 Rear Third Ave. | 200,000 | 42,775 | 242,775 |
| 5. 517 Third Ave. | 38,500 | none | 38,500 |
| 6. 519 Third Ave. | 24,000 | 73,000 | 97,000 |
| 7. 529-531 Third Ave. | 47,000 | 47,000 | 94,000 |
| 8. 533-535 Third Ave. | 47,000 | 71,000 | 118,000 |
| 9. 2101 Kennon Lane | 22,500 | 127,500 | 150,000 |
| 10. 115 Fairfax Dr. | 14,900 | 68,100 | 83,000 |
| Totals | $544,100 | $815,175 | $1,259,275 |
| | | Rounded to | $1,360,000 |

It is the conclusion of the appraisers that the combined market value of the subject properties as of April 25, 1980, was:

ONE MILLION THREE HUNDRED SIXTY THOUSAND DOLLARS
($1,360,000).

The handwritten notations include illegible writing to the left of the numbered columns, a semi-circular line connecting numbers 5 to 8, and circles around the $150,000 and $83,000 amounts in the total column for lines 9 & 10, as well as the following:

$1,360,000
- 150,000 KENNON LANE [number 150,000 circled]
-  83,000 FAIRFAX DRIVE [number 83,000 circled]
$1,270,000 APPRAISED VALUE OF PROPERTY GIVEN TO SAM

+ EVERYTHING ELSE THAT BELONGED TO HUNTINGTON PIPING AND BILLY DEWEESE TO RUN THE BUSINESS SO SAM STILL WOULDN'T HAVE TO WORK!

8

is alleged to be the reason Dorothy left her entire estate to Jeffrey.[11]   Additional circumstantial evidence showed Jeffrey arranged to have Farrell draft the will in question and that he may have taken Dorothy to Farrell's office to execute the will.  On that issue, Brown testified that:

> Q.     Do you know how [Dorothy] got [to the will signing]?
>
> A.     I think Jeff[rey] may have brought her, but I'm not sure.
>
> Q.     What makes you think Jeff[rey] may have brought her?
>
> A.     I actually don't remember, but I know someone brought her.  I don't think she came by herself.
>
> Q.     Why not?
>
> A.     I don't know the answer to that.

Dorothy came to be Farrell's client because Jeffrey placed Dorothy in touch with Farrell to draft a new will.  Farrell testified that Jeffrey was his "best friend, other than family" and that they had known each other for 30-35 years.  They were such great friends that nearly every Wednesday, Farrell and Jeffrey had lunch.  Jeffrey informed Farrell that his mother would like him to write a will for her and Farrell agreed to do so, despite never having performed any legal work for Dorothy.  Dorothy contacted Farrell and Farrell took notes of that conversation. Those notes indicated that Dorothy believed Stephen owed Dorothy $150,000 from the sale of the family business, that Dorothy believed she had received nothing from her husband's estate, that Dorothy believed Stephen had taken a number of cars from her late husband without paying for them, and that Dorothy thought she owned an interest in one of Stephen's businesses.  Farrell's notes further show that Dorothy believed that Stephen "has everything" and Dorothy "feels [Stephen] has monies that belong to her," and that she "want[s] to leave everything to Jeff[rey]." Farrell prepared a memo following his "numerous conversations" with Dorothy that states, in part, that Dorothy "informed me that she felt [Stephen] had obtained more than his fair share of his father's property over the years and she wanted to leave everything to Jeff[rey]."  The will was prepared by Farrell at Dorothy's direction and Farrell provided testimony regarding his discussions with Dorothy, noting that:

> I had numerous conversations with her, where she expressed her desires.  She was clear.  She was consistent.  She asked

_____

[11] Not shown on the list, Stephen acknowledged he received a gift from Marshall of all the common shares of stock in Appalachian Builders Corporation, worth $739,500.

very pointed questions. She wanted to know about her husband's estate. She wanted to know about the cars. She wanted to know about the $300,000. And she was very clear about her instructions. So I was satisfied as to her competency.

During all of his conversations with Dorothy, Farrell testified in his deposition that "she was very concise and precise in what she wanted done."

Demonstrating the formalities of the will signing, Farrell, Brown, and Snow provided affidavits about the discussions during the execution of the will regarding the soundness of Dorothy's mind. Their affidavits each contain the exact same language: "That on September 7, 2007, I had discussions with Dorothy A. Hood for the purposes of satisfying myself that Mrs. Hood was of sound mind, understood her business and the reason she was present that day and how she wished to dispose of her property." Farrell's prior deposition states this discussion included:

Q. Did you ask her any questions that would sort of test whether or not she had sound memory?

A. I don't have a specific memory, but in this case, I'm sure I did ask. I'll say general competency questions, anticipating the litigation.

Q. Such as?

A. What day are we on? What month is it? Who is the president? Do you understand why we are here today? Questions like that.

Q. Would you have gone into detail, such as-

A. Detail?

Q. – you're – do you understand that you're choosing to give all of your estate to one of your two sons?

A. I don't remember saying that. I would have – probably just general questions, current events.

Brown testified she personally asked no questions during the will signing but had this recollection of Farrell's discussion with Dorothy:

10

Q. Okay. Now, tell me the questions that Judge Farrell asked her.

A. I don't recall specific questions, but I know they were to orient her to day, time and place.

Q. Again, to the best of your memory.

A. Honestly, I don't remember specific questions, but I know they were – she knew the day. She knew the time. She knew where she was. Those were the questions that he asked.

Subsequent to the will signing, there is no dispute that Dorothy was found to suffer from dementia, rendering her incompetent. On January 23, 2008, Dr. Mohammed Ahmed made that finding. From our review of the medical records, this finding was confirmed by others and resulted in Dorothy being placed in a nursing home. On January 28, 2008, Dorothy was found incompetent to make "health care decision[s], to make an informed choice regarding the alternatives presented, and to communicate that choice in an unambiguous manner." On January 31, 2008, she was placed in a long-term assisted living facility where she ultimately passed away on July 20, 2013.

Presented with these facts, the circuit court found that there were no questions of material fact as to Dorothy's testamentary capacity, whether Jeffrey interfered with a testamentary bequest to Stephen, or whether Jeffrey exercised undue influence over her will. Accordingly, the circuit court granted summary judgment to Respondents. Stephen now appeals from that grant of summary judgment.

## II. STANDARD OF REVIEW

"A circuit court's entry of summary judgment is reviewed de novo." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). We are also mindful that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963). Finally, a circuit court is not to substitute its judgment for that of a jury: "The question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syl. Pt. 5, *Id.*

## III.  ANALYSIS

### A.  Lack of Testamentary Capacity

West Virginia Code § 41-1-2 (1957) provides the general rule that "[n]o person of unsound mind, or under the age of eighteen years, shall be capable of making a will."  This requires for one to make a valid will one must have testamentary capacity.  In Syllabus Point 2 of *Nicholas v. Kershner*, 20 W. Va. 251, 1882 WL 3513 (1882), this Court established the test for testamentary capacity:

> It is not necessary, that a person should possess the highest qualities of mind, in order to make a will, nor that he should have the same strength of mind, which he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life; but it is sufficient, if he understand the nature of the business, in which he is engaged, has a recollection of the property, which he means to dispose of, the objects of his bounty, and the manner, in which he wishes to distribute it among them.

This holding was slightly modified in Syllabus Point 3 of *Stewart v. Lyons*, 54 W. Va. 665, 47 S.E. 442 (1903), in which this Court held:

> It is not necessary that a testator possess high quality or strength of mind, to make a valid will, nor that he then have as strong mind as he formerly had. The mind may be debilitated, the memory enfeebled, the understanding weak, the character may be peculiar and eccentric, and he may even want capacity to transact many of the business affairs of life; still it is sufficient if he understands the nature of the business in which he is engaged when making a will, has a recollection of the property he means to dispose of, the object or objects of his bounty, and how he wishes to dispose of his property.

*Id*.  Accordingly, testamentary capacity requires one "to understand the nature and consequences of his act, the property to be disposed of, and the objects of his bounty."  Syl. Pt. 1, in part, *Payne v. Payne*, 97 W. Va. 627, 125 S.E. 818 (1924).  This standard is lower than that required to enter into a contract or prepare a deed.  "Greater mental capacity is

required to execute a deed or contract than a will." Syl. Pt. 4, *Prichard v. Prichard*, 135 W. Va. 767, 65 S.E.2d 65 (1951).

The question of testamentary capacity is determined at the time the will was made. "In Syllabus Point 4 of [*Stewart*], this Court explained that "[w]hen incapacity of a testator is alleged against a will, the vital question is as to his capacity of mind at the time when the will was made." *James v. Knotts*, 227 W. Va. 65, 71, 705 S.E.2d 572, 578 (2010). "The time to be considered in determining the capacity of the testator to make the will is the time at which the will was executed." Syl. Pt. 3, *Frye v. Norton*, 148 W. Va. 500, 135 S.E.2d 603 (1964).[12]

The circuit court found that, "Stephen . . . has not submitted evidence sufficient enough to overcome the evidence presented by the [Respondents] concerning the testamentary capacity of [Dorothy]." However, as noted above, Stephen clearly offered evidence demonstrating a genuine issue of material fact that Dorothy lacked testamentary capacity prior to and following the execution of her will. Additionally, it is undisputed that on January 28, 2008, a mere four months after executing the will, Dorothy was found to be permanently incapacitated due to dementia and was thereafter moved to a long-term living facility. Our law has long held that the conduct of the testator, before and after execution, is admissible in a will contest to challenge testamentary capacity at the time the will was made:

> The conduct and declarations of the testator both before and after he executed the will are competent evidence to show his capacity at the time the will was executed, when the issue is upon the sanity of the testator; but, after the will is made, such conduct and declarations manifesting ignorance of the

---

[12] Stephen asks this Court to modify the current law that the operative time to determine testamentary capacity is when the will was executed. *See* Syl. Pt. 8, *Floyd v. Floyd*, 148 W. Va. 183, 133 S.E.2d 726 (1963); Syl. Pt. 6, *Montgomery v. Montgomery*, 147 W. Va. 449, 128 S.E.2d 480 (1962); Syl. Pt. 8, *Ritz v. Kingdon*, 139 W.Va. 189, 79 S.E.2d 123 (1953), *overruled on other grounds by State v. Bragg*, 140 W. Va. 585, 87 S.E.2d 689 (1955), and *holding modified on other grounds by Law. Disciplinary Bd. v. Ball*, 219 W. Va. 296, 633 S.E.2d 241 (2006); *Prichard*, 135 W.Va. at 774, 65 S.E.2d at 69; Syl., *Moore v. Moore*, 120 W. Va. 468, 199 S.E. 257 (1938); Syl. Pt. 3, *Pickens v. Wisman*, 106 W. Va. 183, 145 S.E. 177 (1928); Syl. Pt. 1, *Payne*; Syl. Pt. 4, *Stewart*; Syl. Pt. 18, *Kerr v. Lunsford*, 31 W. Va. 659, 8 S.E. 493 (1888). We see no need to modify this holding because West Virginia law has also long held that evidence of a testator's conduct and declarations before and after execution of a will is probative evidence to determine testamentary capacity at the time of a will's execution. *See* Syl. Pt. 13, *Kerr*.

existence of the will are not competent to show that the testator never had made the will in question.

*La Rue v. Lee*, 63 W. Va. 388, 394, 60 S.E. 388, 391 (1908). Allowing such testimony has been approved by this Court since at least 1888. In the 1888 case of *Kerr*, testimony was properly adduced regarding the mental condition of the testator both before and after the execution of the will:

> The proponents, to maintain the issue on their part, introduced the will of Lewis Lunsford, deceased, dated the 27th day of April, 1881, also the two subscribing witnesses to the will, B. S. Allison and W. H. Hearne. These two witnesses testified to the execution of the will, and to the mental capacity of the testator, and the proponents then rested. The contestants then offered many witnesses, who gave evidence tending to show that at the date of the execution of the will the testator was wholly incompetent to make a will. This testimony had taken a very wide range, from several years before the execution of the will to several years after, and to his death, in 1883, and showed that more than a year after the will was executed, on motion and petition of one of the contestants, the estate of the testator was put into the hands of a committee.

*Kerr*, 31 W. Va. at 666, 8 S.E. at 496-97. The *Kerr* Court held, in Syllabus Point 13, that "[e]vidence of business transactions by the testator, both before and after the execution of the will, indicating his mental condition, are admissible on the question of his capacity at the time the will was executed." *Id.*

The evidence that Stephen placed before the circuit court was evidence of Dorothy's mental condition before and after the execution of the will. This evidence included testimony from friends and family that established that Dorothy suffered from dementia as early as 2006. Their collective testimony shows Dorothy was both confused and forgetful. Respondents argue that claims by friends and acquaintances of "insignificant foibles" have no bearing on testamentary capacity. However, when viewed as a whole, this evidence clearly paints a picture of lessening mental acuity beginning in 2006.

Additionally, the medical records also contain notations that Dorothy was suffering from dementia beginning in 2006. The records indicate she was forgetful and "neuro abnormal" in November 2006. In June 2007, Dorothy was "very confused about calling" Dr. Yingling's office. In July 2007, Dr. Smith noted that he did not obtain further history from Dorothy "secondary to her dementia." Conversely, Drs. Ataro and Elbash, in a visit in July 2007, noted Dorothy was "alert" and "oriented to time, place, and person," and Dr. Yingling provided an affidavit that his long-time patient had the requisite

14

testamentary capacity. Even so, following execution of the will, there was clear medical evidence that Dorothy was experiencing symptoms of dementia when she was found incompetent in January 2008. The evidence from friends and family, coupled with the medical records, demonstrate the existence of a genuine issue of material fact as to Dorothy's testamentary capacity.

We next examine the evidence adduced from the attesting witnesses, Dorothy's attending physician, and the lawyer who drafted the will. This evidence is entitled to great weight:

> The evidence of attesting witnesses, of attending physicians, and of a lawyer who drafted the will, is entitled to great weight on the question of mental capacity of a testator to make a will. Although such evidence in favor of a will is not conclusive, it must be clearly outweighed by other evidence in order to support a verdict against the validity of the will.

Syl. Pt. 3, *Floyd*. At the same time, "'[t]he circuit court's function at the summary judgment stage is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)." *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 59, 459 S.E.2d 329, 336 (1995). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216." *Id.*

The opinions of Drs. Miller and Clayman plainly contrasted with the opinion of Dr. Yingling. Both Drs. Miller and Clayman opined that Dorothy lacked testamentary capacity at the time the will was executed, which are in direct conflict with Dr. Yingling's opinion that Dorothy had the requisite testamentary capacity. Respondents maintain that the reports of Drs. Miller and Clayman are unreliable because they completely ignored some medical records, only reviewed other records, never examined, tested, or had any contact with Dorothy, and based their opinions upon anecdotal evidence. However, the circuit court improperly discounted Dr. Miller's report, finding that it was not supported by evidence presented to the circuit court. This was not true. The records reviewed by Dr. Miller were provided to the circuit court. Thus, there is an issue of fact as to the divergent opinions reached by Drs. Miller and Clayman and Dr. Yingling.

Likewise, the evidence from Farrell and Brown as to Dorothy's disposition when she executed the will is also entitled to great weight. Stephen produced clear evidence that the deposition testimony of Farrell and Brown conflicted with later-made affidavits. Both Farrell and Brown state the exact same thing in their affidavits: "[t]hat on September 7, 2007, I had discussions with Dorothy A. Hood for the purposes of satisfying

15

myself that Mrs. Hood was of sound mind, understood her business and the reason she was present that day and how she wished to dispose of her property." However, their prior deposition testimony paints a different picture. Few questions were asked of Dorothy to establish her testamentary capacity and the only questions asked were to orient her to day, time, and place. Respondents argue that there is no inconsistency between the deposition testimony and affidavits of Farrell and Brown. We disagree. The affidavits establish that Dorothy knew the "nature and consequences of [her] act, the property to be disposed of, and the objects of [her] bounty." Syl. Pt. 1, in part, *Payne v. Payne*, 97 W. Va. 627, 125 S.E. 818 (1924). However, the prior deposition testimony does not establish that fact.

There are plain conflicts between Dr. Yingling's opinions and those of Drs. Miller and Clayman and the fact witness testimony regarding Dorothy's mental capacity. A jury should determine whether the great weight Dr. Yingling, Farrell, and Brown are entitled to should be outweighed by the fact testimony, medical records, and opinions offered by Stephen. The circuit court improperly weighed this evidence and disregarded the inconsistencies readily pointed out by Stephen.

## B.     Undue Influence

The circuit court further erred in granting summary judgment as to the question of whether Jeffrey exercised undue influence over his mother's decisions with regard to her will. In *Forney v. Farrell*, 4 W. Va. 729, 1871 WL 2781 (1871), this Court identified what constitutes undue influence in the context of a will:

> 1. Undue influence to avoid a will must be such as to overcome the free agency of the testator at the time the instrument was made.

> 2. If undue influence be proved to have been exercised over the testator, both before and after the execution of the will, the facts may be given in evidence to the jury, from which they may infer, if they see proper, that undue influence was exercised over the testator at the time the will was made.

Syl. Pts. 1-2, *id.* More recently, this Court has affirmed the principles established in *Forney* and expounded upon them:

> 13. In a suit to impeach a will the burden of proving undue influence is upon the party who alleges the exercise of such influence.

> 14. Undue influence, to invalidate a will, must be such influence as destroys the free agency of the testator and, in

16

legal effect, amounts to force and coercion; but such force and coercion need not be physical or applied at any particular time.

15. Undue influence which will invalidate a will is never presumed but must be established by proof which, however, may be either direct or circumstantial.

16. Proof of opportunity for, or possibility or suspicion of, the exercise of undue influence is not alone sufficient to establish undue influence.

17. Influence which arises from acts of kindness and attention to the testator, from attachment or love, from persuasion or entreaty, or from the mere desire to gratify the wishes of another, if free agency is not impaired, does not constitute, and is not alone sufficient to establish, undue influence.

18. Proof of undue influence which will invalidate a will must be consistent with the exercise of such influence and inconsistent with the absence of such influence.

19. To warrant a finding of undue influence which is based on circumstantial evidence the established facts must be inconsistent with any theory other than that of undue influence.

20. Mere suspicion, conjecture, possibility or guess that undue influence has been exercised is not sufficient to support a verdict which impeaches a will on the ground of undue influence.

Syl. Pts. 13-20, *Ritz*. "Undue influence cannot be based on suspicion, possibility or guess that such undue influence had been exercised, but must be proved and the burden of proof of such issue rests on the party alleging it." Syl. Pt. 7, *Floyd*.

Ample circumstantial evidence was adduced that establishes a genuine issue of material fact as to whether undue influence was exerted upon Dorothy in this case. This evidence showed that Jeffrey may have given Dorothy a list of assets which arguably included incorrect and misleading information. On its face, this list of assets demonstrated that Stephen had previously received multiple family assets during his lifetime. There was also circumstantial evidence that Jeffrey may have driven Dorothy to the will signing. Additionally, at the time the will was drafted, Jeffrey made contact with Farrell, his long-time friend, to draft Dorothy's will, although Farrell admitted he never had any prior attorney-client relationship with Dorothy. Further, in mid-September 2007, just after the

17

will was executed, Jeffrey told Dorothy's primary care physician that she was exhibiting odd behavior and that her mental condition was deteriorating, despite having just recently executed her will. Although Respondents maintain that there is no evidence Jeffrey did anything to convince Dorothy to disinherit Stephen or to influence the drafting of her will in any way, Stephen demonstrated the presence of clear issues of material fact as to whether or not Jeffrey exerted undue influence over his mother.

## C. Tortious Interference with Testamentary Bequest

Stephen also alleges that the circuit court erred in granting Respondents' motion for summary judgment as to Stephen's claim that Respondents tortiously interfered with Dorothy's will.

It is clear that "[a]n intended beneficiary may sue for tortious interference with a testamentary bequest." Syl. Pt. 2, *Barone v. Barone*, 170 W. Va. 407, 294 S.E.2d 260 (1982). "It is analogous to tortious interference with business interests or tortious interference with contractual relations." *Id.*, 170 W. Va. at 411, 294 S.E.2d at 264 (citations omitted). We have held that:

> To establish prima facie proof of tortious interference, a plaintiff must show:
>
> (1) existence of a contractual or business relationship or expectancy;
>
> (2) an intentional act of interference by a party outside that relationship or expectancy;
>
> (3) proof that the interference caused the harm sustained; and
>
> (4) damages.
>
> If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

18

Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 173 W. Va. 210, 314 S.E.2d 166 (1983).

The prior will that was revoked by the will at issue in this case divided Dorothy's estate equally between Jeffrey and Stephen. Jeffrey's purported actions, as noted above, would, if proven, go toward establishing that (1) there was an existing will; (2) Jeffrey interceded; (3) such intercession caused Dorothy to change her will to disinherit Stephen; and, (4) Stephen was disinherited from half of Dorothy's estate. Stephen has presented sufficient evidence to create a material question of fact as to each of these factors, thus precluding the entry of summary judgment in favor of Respondents.

**D. Insane Delusions**

The circuit court granted summary judgment to Respondents as to the question of Dorothy's testamentary capacity, finding that Stephen had to prove that Dorothy was experiencing an insane delusion due to an "extraordinary belief in spiritualism" in order to prevail. What constitutes an insane delusion affecting testamentary capacity has never been thoroughly discussed in West Virginia law. We have found two occasions in will contests in which we have even referred to such concept. *See Kerr* and *Rice v. Henderson*, 140 W. Va. 284, 291, 83 S.E.2d 762, 767 (1954). Because of their lack of detailed analysis, neither case is particularly helpful to answer this question. Thus, we turn to other jurisdictions for guidance. Under Florida law, "[w]here there is an insane delusion in regard to one who is the object of the testator's bounty, which causes him to make a will which he would not have made but for that delusion, such will cannot be sustained." *Newman v. Smith*, 77 Fla. 633, 677-78, 82 So. 236, 249 (1918) (citation and quotation omitted). A number of courts have found that a person lacks testamentary capacity when an insane delusion materially affects the will's property disposition. *See In re Russell's Will*, 44 N.W.2d 231, 235 (Wis. 1950) (delusion must "materially affect the making of the will"); *Kingdon v. Sybrant*, 158 N.W.2d 863, 866 (N.D. 1968) (insane delusion must materially affect the will); *Matter of Estate of Kesler*, 702 P.2d 86, 88 (Utah 1985) (insane delusion must materially affect disposition of one's property); *Breeden v. Stone*, 992 P.2d 1167, 1171 (Colo. 2000) (insane delusion must materially affect property disposition); *In re Estate of Gallavan*, 89 P.3d 521, 522 (Ill. 2004) (insane delusion must materially affect property disposition). An insane delusion that materially affects a will interferes with the testamentary capacity of the testator:

> [I]f the testator is eccentric or mean-spirited and dislikes family members for no good reason, but otherwise meets the three-prong capacity test, leaving the family members out of the will would not be due to lack of testamentary capacity. However, when mental illness that produces insane delusions renders the testator unable to evaluate or understand his relationships with

the natural objects of his bounty and this inability affects the terms of his will, the testator lacks the mental capacity to make a valid will.

*Matter of Est. of Killen*, 937 P.2d 1368, 1372 (Ariz. Ct. App. 1996).

Because West Virginia is a notice pleading state, *See* W. Va. R. Civ. P. 8(a) (requiring a pleading setting "forth a claim for relief" to "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."); *id.* 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct."), and an insane delusion affecting testamentary capacity is not necessarily an independent cause of action, pleading a lack of testamentary capacity generally could encompass an allegation that Dorothy was under insane delusions that affected the disposition of property in her will. Despite the fact that a lack of testamentary capacity could be established by several factors, the circuit court relied upon *Rice* to conclude that an insane delusion *requires* an "extraordinary belief in spiritualism." However, it is clear that a showing of such belief is not, as the circuit court found, the only way one can be shown to lack testamentary capacity based upon an insane delusion. Moreover, such a showing would not, in and of itself, necessarily constitute a lack of testamentary capacity. Indeed, this Court in *Rice* expressly found that "testamentary capacity cannot be determined alone by what one believes." *Rice*, 140 W. Va. at 291, 83 S.E.2d at 767. Thus, the circuit court erred in finding that Stephen was required to demonstrate that Dorothy was under an "extraordinary belief in spiritualism," in order to establish an insane delusion affecting testamentary capacity.

Because the circuit court erred in granting summary judgment on this issue, we remand this issue for the circuit court to consider whether Dorothy was under an insane delusion, and, if so, if such insane delusion materially affected the property disposition in her September 7, 2007 will.

## IV. CONCLUSION

For the foregoing reasons, we find the circuit court erred and we reverse and remand for further proceedings.

Reversed and remanded.

**ISSUED:** November 3, 2023

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

20

Justice William R. Wooton
Justice C. Haley Bunn